**In re TRI–STAR PICTURES, INC., LITIGATION.**

Supreme Court of Delaware.

Submitted: Sept. 22, 1992.
Decided: Nov. 24, 1993.
As Corrected Dec. 8, 1993.

William Prickett (argued), Michael Hanrahan and Ronald A. Brown, Jr., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington;

Arthur T. Susman, Susman, Saunders & Buehler, Chicago, IL, and Roger W. Kirby, Kaufman, Malchman, Kaufman & Kirby, New York City, of counsel, for appellant.

James F. Burnett and Donald J. Wolfe, Jr., Potter, Anderson & Corroon, Wilmington; Allen Kezsbom and Debra M. Torres (argued), Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel, for appellees Sony Pictures Entertainment Inc., formerly Tri–Star Pictures, Inc., Victor A. Kaufman, David A. Matalon, Patrick M. Williamson, Judd A. Weinberg and Dan W. Lufkin.

Lawrence A. Hamermesh (argued), and Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, for appellees Coca–Cola Co., CPI Film Holdings, Inc., Ira C. Herbert and Francis T. Vincent, Jr.

Allen M. Terrell, Jr., Richards, Layton & Finger, Wilmington; Robert C. Myers and Anthony J. Viola, Dewey Ballantine, New York City, of counsel, for appellees Home Box Office, Inc., Michael J. Fuchs, E. Thayer Bigelow, Jr. and Joseph J. Collins.

Before MOORE and HOLLAND, JJ., and RIDGELY, President Judge (sitting by designation).

MOORE, Justice.

In this class action the plaintiffs are former minority stockholders of Tri–Star Pictures, Inc. ("Tri–Star" or the "Company") who challenge a business combination between Tri–Star and the Entertainment Business Sector of the Coca–Cola Company (the "Combination"). The Combination, with its related transactions and surrounding facts, is complicated and convoluted—sufficient to daunt any but the most determined analyst or challenger. Shorn of its bristles and fuzz, however, it was the way Coca–Cola, at no significant cost to itself, obtained 80% ownership of Tri–Star. The Court of Chancery dismissed most of plaintiffs' claims as moot because a subsequent merger between Sony USA, Inc. ("Sony") and Tri–Star extinguished plaintiffs' standing to maintain a derivative suit. The defendants were granted summary judgment on plaintiffs' remaining claims because of a failure to adduce suffi-

cient evidence of individual damage arising from the defendants' alleged nondisclosures. Our disposition of these issues is basically determined by this Court's recent decision in *Cede & Co. & Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345 (1993) (Horsey, J.), and our earlier decision of *Weinberger v. UOP*, Del.Supr., 457 A.2d 701 (1983).[1] We find that the plaintiffs alleged sufficient individual injury resulting from the defendants' asserted manipulation of the Combination so as to dilute the cash value and impinge upon the voting rights of the minority's shares. Plaintiffs' claims clearly survive a motion to dismiss under Chancery Court Rule 12(b)(6). Such conduct, taken as true for present purposes, is a breach of the duty of loyalty requiring that the defendants' actions be judged by principles of entire fairness. Since this shifts the burden to the defendants to prove the "most scrupulous inherent fairness of the bargain", *Weinberger*, 457 A.2d at 710, there is no requirement that plaintiffs prove damages to survive a motion to dismiss. Accordingly, the trial court's dismissal of Counts I, II, V and VII of plaintiffs' Amended Complaint are reversed. The dismissal of Count III of plaintiffs' Amended Complaint on grounds of mootness is affirmed.

## I.

### A.

In this class action, plaintiffs are the holders of Tri–Star stock who either were eligible to vote or to direct the voting of Tri–Star shares at the December 15, 1987 meeting where the Combination was approved (the "Class"). This group excludes the defendants and their affiliates as of December 15, 1987. At that time the Class held approximately 43.4% of the 34.5 million outstanding common shares of Tri–Star.

The Company was formed in 1985 to succeed to the business of a joint venture organized earlier by CBS, Inc. ("CBS"), CPI Film Holdings, Inc., a subsidiary of Coca–Cola ("CPI"), and an affiliate of Home Box Office, Inc. ("HBO"), a subsidiary of Time Incorporated. Tri–Star was principally engaged in the production, distribution, and exploitation of feature-length motion pictures and television programs.[2]

Defendant Coca–Cola was Tri–Star's largest single stockholder in 1985, owning 12,708,333 shares, representing 36.8% of its common stock. Coca–Cola became involved in the entertainment business upon acquiring Columbia Pictures Industries, Inc., and incorporated it into what became Coca–Cola's Entertainment Business Sector ("Entertainment Sector"). Coca–Cola later expanded its Entertainment Sector through other acquisitions.

Defendant HBO, a wholly owned subsidiary of Time Incorporated ("Time"), is engaged in programming and marketing pay-television services. HBO owned 3,125,000 shares (9%) of Tri–Star's common stock.[3] HBO has had significant business relationships with Tri–Star and Coca–Cola.

Tri–Star had two other major stockholders: Technicolor, Inc. ("Technicolor"), which owned 7.2%, and Rank American, Inc. ("Rank"), which owned 3.6%. The combined holdings of these four shareholders repre-

---

1. *Cede* and *Weinberger* were decided by us after full trials on the merits. Throughout this opinion, therefore, it must be borne in mind that our discussion and disposition of the issues here, while similar to certain aspects of *Cede* and *Weinberger*, arise in the context of motions to dismiss. As a result, all of the plaintiffs' well-pleaded averments are taken as true. Thus, given the outcome of *Cede* and *Weinberger* on appeal, where a more rigorous scope and standard of review applied, a reversal here, applying the fairness doctrine, is both foreordained and mandated.

2. Although Tri–Star's name was later changed to Columbia Pictures Entertainment, Inc., and

thereafter to Sony Pictures, Inc., for purposes of this opinion it will be referred to as "Tri–Star".

3. The Court of Chancery dismissed HBO as a defendant in *Siegman v. Tri–Star Pictures, Inc.*, Del.Ch., C.A. No. 9477, Jacobs, V.C. 1989 WL 48746 (May 5, 1989, *revised* May 30, 1989). Plaintiffs have not briefed, and thus do not challenge the court's dismissal of HBO as a defendant, even though plaintiffs name HBO as an appellee. For this reason, that portion of the appeal pertaining to HBO's dismissal is deemed abandoned. *Murphy v. State*, Del.Supr., 632 A.2d 1150 (1993) (Holland, J.).

sented 56.6% of the Company's common stock.

The individual defendants are Victor A. Kaufman, Michael J. Fuchs, David A. Matalon, E. Thayer Bigelow, Jr., Joseph J. Collins, Patrick M. Williamson, Judd A. Weinberg, Ira C. Herbert, Dan W. Lufkin and Francis T. Vincent, Jr., all members of Tri–Star's board of directors at the time of the Combination. Of this group, Messrs. Herbert, Vincent, and Williamson were senior executives of Coca–Cola or a Coca–Cola affiliate and substantial owners of Coca–Cola stock. Three other members of the group, Messrs. Weinberg, Lufkin, and Matalon, also owned substantial shares of Coca–Cola stock that under the terms of the Combination entitled them to a significant personal financial benefit upon approval of the transaction. Both Messrs. Lufkin and Williamson were nominated to their positions on the Tri–Star board by Coca–Cola. Finally, Messrs. Bigelow and Collins are senior officers of Time and its subsidiary, HBO, which had significant commercial agreements with both Coca–Cola and Tri–Star before the Combination.

### B.

Three basic transactions are significant to the issues before us. They are certain voting agreements, the Combination itself, and a transfer agreement.

#### The Voting Agreements

CPI, a wholly owned subsidiary of Coca–Cola, and HBO entered into the first of two such agreements with Tri–Star. One agreement provided that: (1) Coca–Cola and HBO would each designate four nominees to Tri–Star's ten member board, (2) CPI (on behalf of Coca–Cola) and HBO would vote their combined 45.8% share interest in favor of each other's nominees to the board of directors, and (3) they would not solicit proxies in opposition to any recommendation of the Tri–Star board. Under a second agreement, Technicolor and Rank were obligated to vote their combined 10.8% of the Company's common stock in favor of any proposal submitted to the stockholders on the recommendation

of a majority of Tri–Star's board of directors. The net effect of these two agreements was that Coca–Cola and HBO retained effective control of Tri–Star with 56.6% of the common stock under their command.

#### The Combination

Plaintiffs aver that as early as May, 1987, Coca–Cola had been contemplating a combination of its Entertainment Sector and Tri–Star to rid Coca–Cola's balance sheet of the Entertainment Sector's undesirable assets. The Combination originated at a meeting in August 1987, at which Coca–Cola's president proposed to Tri–Star's chief executive officer, Victor Kaufman, that the two companies explore a transaction to combine Tri–Star and the Entertainment Sector. Within weeks, Coca–Cola had developed a detailed plan for the Combination of Tri–Star and the Entertainment Sector, out of which a new film entertainment company would emerge. Management representatives of Coca–Cola and Tri–Star then met to discuss the Combination and eventually negotiated a written proposal labeled the "Transfer Agreement." On August 31, 1987, Coca–Cola submitted the Transfer Agreement to the Tri–Star board of directors for its approval.

#### The Transfer Agreement

The Transfer Agreement provided that Tri–Star would acquire the Coca–Cola subsidiaries comprising the Entertainment Sector at their unappraised book value of $745 million in exchange for just over 75 million shares of newly issued Tri–Star common stock that, when added to the Tri–Star shares Coca–Cola already owned, would increase the latter's equity interest in Tri–Star from 36% to 80%.[4] Thereafter, Coca–Cola intended to declare a special dividend to its stockholders, of 31,400,000 of the approximately 75,000,000 Tri–Star shares it was to receive in the Combination. This would reduce Coca–Cola's common stock holdings in Tri–Star to 49%.

The number of shares to be received by Coca–Cola under the terms of the Transfer Agreement was based on a net book value

---

**4.** Defendants conceded at oral argument that every aspect of this transaction was structured to achieve Coca–Cola's 80% ownership of Tri–Star.

ratio of the Entertainment Sector assets ($745 million) to those of Tri–Star ($265 million). The net book values used to set the ratio were determined by Coca–Cola's chief financial officer on July 31, 1987, and were clearly designed to ensure Coca–Cola's 80% ownership of Tri–Star. Under the Transfer Agreement, Coca–Cola retained certain assets of the Entertainment Sector, including $300 million in cash, a $240 million inter-company receivable, certain real estate, stock and assets. Coca–Cola also reserved the right to purchase $100 million of newly created Tri–Star preferred stock having liquidation and dividend preferences over the common stock.

Defendants' proxy materials seem to suggest that Coca–Cola acquired Tri–Star by transferring to it $745 million in unappraised Entertainment Sector assets in exchange for 75,176,667 Tri–Star shares having a market value of $12–13 per share. Coca–Cola therefore received stock worth between $900 and $977 million. However, the notes to the unaudited *pro forma* combined condensed financial statements disclose that the transaction was actually treated as a purchase of Tri–Star by the Entertainment Sector for $291 million. (A172).[5] Interestingly, the body of the proxy statement omits reference to the $291 million purchase price, stating that "the Combination will be accounted for as a purchase by the Entertainment Sector of Tri–Star in a step-purchase transaction". (A163).

The Transfer Agreement also required stockholder approval of several restrictive amendments to Tri–Star's certificate of incorporation and bylaws. These amendments were an integral part of the Combination. They provided for a classified board, elimination of the stockholders' right to act by written consent under 8 *Del.C.* § 228, and a 66⅔% super-majority voting requirement for certain stockholder actions. The practical effect of the super-majority provision gave Coca–Cola voting power to veto any merger, business combination or asset sale involving Tri–Star. The certificate amendments also sought to reduce liability to Coca–Cola, Tri–Star and Time, including all officers and di-

5. References are to plaintiffs' appendix.

rectors, for taking corporate opportunities that might belong to Tri–Star.

Allen & Company Incorporated ("Allen") rendered a fairness opinion to Tri–Star that "the financial terms of the Combination are fair and equitable to the common stockholders of Tri–Star other than the Coca–Cola Company." It received fees totaling $5 million for services rendered in connection with the Combination and related matters, which included participation in developing the terms of the Combination (A143). Tri–Star also paid Allen's expenses and agreed to indemnify it against certain liabilities, including those arising under the federal securities laws (A143).

The relationships of Allen and Coca–Cola are inextricably tied. Herbert A. Allen, president, chief executive officer, and a director of Allen, was the beneficial owner of over 1.1 million shares of Coca–Cola stock. He also was a director of both Coca–Cola and Columbia Pictures Industries, Inc. He was chairman of the board of directors of Columbia before its acquisition by Coca–Cola in June 1982, and was scheduled to become, and became, a director of the combined entity. (A195). According to the proxy statement, Allen has provided investment banking services to Tri–Star and Coca–Cola. At the time it gave Tri–Star the fairness opinion Allen was a party to an agreement to provide investment banking services to the Entertainment Sector, and expected to seek to continue providing investment banking services to both the combined entity and Coca–Cola. (A133).

Allen's fairness opinion *issued to Tri–Star* is almost reminiscent of that in *Weinberger*, 457 A.2d at 706–07, in terms of its questionable reliability under the circumstances of this transaction. This is demonstrated in part by certain limitations of the opinion, which state:

In formulating our opinion we have relied on information furnished to us by Tri–Star *and the Coca–Cola Company* ... (emphasis added).

\*   \*   \*   \*   \*   \*

We have not, however, undertaken or obtained an independent appraisal of the assets of the Entertainment Business Sector. For the purpose of expressing our opinion set forth herein, we have assumed the accuracy and completeness of all such information. (A316).

## C.

Consistent with the General Corporation Law of Delaware, Coca–Cola sought approval of the Combination from both the board of directors and Tri–Star's stockholders. The Combination detailed in the Transfer Agreement was unanimously approved by all seven directors who voted at the September 30, 1987 meeting, including four board members who were either Coca–Cola executives or stockholders.[6] On October 1, 1987, the Transfer Agreement was executed, setting the date for stockholder approval of the Combination as December 15, 1987. Despite the early execution of the Transfer Agreement, the defendants' three-hundred page complex and convoluted proxy statement was not mailed to the stockholders until November 24, 1987, just twenty days before the meeting.

The proxy materials disclosed that under the Transfer Agreement Coca–Cola would not vote its shares in favor of the Combination unless a majority of other shares first approved the Combination. Given the effect of the two previously described Voting Agreements between Coca–Cola, HBO, Technicolor and Rank, this essentially meant that before Coca–Cola could vote its shares in favor of the Combination, 24.4% of the common stock not owned by Coca–Cola and its related entities had to first approve the Transfer Agreement. (A140). The Combination was submitted to Tri–Star stockholders for approval at a special meeting held on December 15, 1987. The Combination (including the certificate amendments) was approved by the requisite vote. The formal closing of the Combination occurred on January 27, 1988.

### The Fallout

Certain significant events occurred thereafter which bear upon the structural fairness of the transaction. See Weinberger, 457 A.2d at 711–12. First, on January 27, 1988, the same day in which the Combination closed, Tri–Star made a public offering of $575 million in subordinated debt and notes, roughly equal to the sum of cash and receivables retained by Coca–Cola from the Entertainment Sector. Although defendants characterize their offering as a standard refinancing of old debt under a new credit agreement, the fact remains that no mention was made of this offering to the stockholders in the proxy materials.

Then, less than two months later on March 15, 1988, Coca–Cola and Tri–Star jointly announced that Tri–Star would write down the book value of the Entertainment Sector assets, just acquired from Coca–Cola under the Transfer Agreement, by nearly $200 million. Although defendants explained this action as taking advantage of a "stub period" to record certain adjustments to the book value of those assets, had Coca–Cola taken the $200 million write down prior to the Combination the book value attributed to Coca–Cola's assets would have been $545 million instead of $745 million, and materially altered the net book value ratio which was constructed to deliver 80% control to Coca–Cola. As a result of this write down, Tri–Star suffered an immediate after tax loss of $105 million.[7]

### The Sony Merger

On September 27, 1989, during the pendency of this lawsuit, Sony and Coca–Cola executed a merger agreement whereby Sony Company ("Sony Acquisition") made a tender offer for all of Tri–Star's outstanding shares at $27 cash per share. The tender offer was

6. Mr. Williamson was an executive Vice–President of the Entertainment Sector, a wholly owned Coca–Cola subsidiary. Messrs. Weinberg, Lufkin and Matalon all owned substantial shares of Coca–Cola stock and thus stood to personally profit from the post-distribution dividend of Tri–Star shares.

7. In their brief, the defendants try to explain away this loss as being unrelated to the write down. The Court need not evaluate their explanation, however, because under the standard of review applicable to this decision the facts must be considered in a light most favorable to the plaintiffs.

to be followed by a cash out merger for all untendered shares. At the time of the tender offer, Tri–Star stock had been trading in a range from $7.25 to $16 per share. Upon completion of the tender offer, Sony Acquisition was merged into Tri–Star and each remaining stockholder was cashed out at $27 per share. The Sony merger was implemented on November 6, 1989, and Tri–Star became a wholly-owned subsidiary of Sony.

### D.

The Complaint, filed on December 15, 1987, and amended on April 5, 1988, alleged numerous violations of Delaware law including breaches of fiduciary duty, inadequate and misleading disclosures, and illegal by-law amendments, all of which arose out of the Combination. We address only those portions of the Amended Complaint that are pertinent here.

Count I is based on alleged breaches of the fiduciary duty of loyalty in that the Combination involved self-dealing, constructive fraud, and did not meet the test of entire fairness that Coca–Cola, as the controlling stockholder, owed the minority. Count II alleges breaches of the duty of disclosure. Count III challenges the validity of certain charter amendments, including Article Sixth thereof. Count V charges manipulation of control to benefit Coca–Cola to the improper detriment of the minority. Count VII charges conspiracy in that Coca–Cola aided and abetted Tri–Star directors in their breaches of fiduciary duty.[8]

Plaintiffs began discovery in early January, 1988, but at defendants' behest all discovery was stayed. Defendants moved to dismiss the Amended Complaint, charging that the claims were derivative and that the plaintiffs failed to comply with the demand requirements of Chancery Rule 23.1. Finding that demand was excused, the trial court declined to decide whether plaintiffs' Amended Complaint stated any individual or class claims. *Siegman v. Tri–Star Pictures, Inc.,*

Del.Ch., C.A. No. 9477, Jacobs, V.C., slip op. at 26, 33, 1989 WL 48746 (May 5, 1989, revised May 30, 1989) (*"Tri–Star I"*). However, the court dismissed two of the plaintiffs' challenges to the Tri–Star certificate amendments (under Count III) and the entire complaint against HBO.

Between May and October of 1989 plaintiffs took some discovery by propounding interrogatories and seeking document production. They then moved for partial summary judgment under Count III, challenging the validity of Article Sixth of Tri–Star's charter. Thereafter, on November 6, 1989, the Sony–Tri–Star merger was consummated and Article Sixth was not retained in Tri–Star's Amended Certificate of Incorporation. On December 1, 1989, defendants filed their second motion to dismiss on new grounds that the merger had eliminated plaintiffs' standing to maintain derivative claims on behalf of Tri–Star. *In re Tri–Star Pictures, Inc.,* Del.Ch., C.A. No. 9477 (Consolidated), Jacobs, V.C., slip op. 1990 WL 82734 (June 14, 1990) (*"Tri–Star II"*).

As a result, the Court of Chancery dismissed all but two of plaintiffs' claims on the grounds that the Article Sixth cause of action (under Count III) was moot, that the common law fraud claim (Count IV) failed to allege reliance, and that the remaining claims were solely derivative. The court declined to dismiss plaintiffs' other claims relating to inadequate disclosure in the proxy materials and allowed them to proceed on plaintiffs' compensatory damages claim for the wrongful deprivation of the right to vote.

Following additional discovery, defendants moved for summary judgment on the ground that the plaintiffs' theory and evidence of damages were inadequate as a matter of law, since, defendants claim, damages are an indispensable element of the plaintiffs' cause of action. On January 7, 1991, two days before oral argument on that motion, the plaintiffs filed a further response to defendants' inter-

---

**8.** Plaintiffs' failure to brief (a) the dismissal of their attack in Count III on the charter provisions other than Article Sixth, (b) the dismissal, for lack of reliance, of their common law fraud claim in Count IV, and (c) the dismissal of Count

VI, a derivative breach of contract claim, results in abandonment of all those claims on appeal. *Murphy v. State,* Del.Supr., 632 A.2d 1150 (1993) (Holland, J.).

rogatories, reducing their initial $25 per share claim to $4 per share.

On February 21, 1992, the Court of Chancery granted defendants' motion for summary judgment, dismissing all of the plaintiffs' remaining claims on the basis that the plaintiffs had not shown, and could not show, sufficient individual injury to support any award of damages by the court. The plaintiffs appeal on several fronts. They challenge the trial court's February 21, 1992 opinion granting summary judgment and those portions of the May 5, 1989 (revised May 30, 1989) and June 14, 1990 opinions that granted defendants' motions to dismiss.

## II.

■ The defendants' motion to dismiss the supposedly derivative claims was accompanied by deposition excerpts, outside documents, and other exhibits well beyond the scope of the pleadings. It is well settled that when a party moves to dismiss for failure to state a claim pursuant to Rule 12(b), and submits matters outside the pleadings, the motion will be treated as one for summary judgment under Rule 56. *Mann v. Oppenheimer & Co.*, Del.Supr., 517 A.2d 1056, 1059 (1986). It is less clear, however, if a motion to dismiss should be converted into one for summary judgment in the absence of proof that the trial court relied on the accompanying extrinsic evidence. *See Barker v. Huang*, Del.Supr., 610 A.2d 1341, 1348 (1992). At least two federal circuit courts considering the question have held that a motion to dismiss should not be converted into one for summary judgment absent evidence of reliance on the extrinsic materials. *See R.J.R. Services, Inc. v. Aetna Cas. and Sur. Co.*, 895 F.2d 279, 281 (7th Cir.1989); *Childers v. Independent School Dist. No. 1 of Bryan County, State of Okla.*, 676 F.2d 1338, 1340 (10th Cir.1982); *see also* 2A James W. Moore, et al., Moore's Federal Practice ¶ 12.-09[3] at 12–108 n. 10 (2d Ed.1993) (citing *Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977)).

■ When interpreting a statute or rule of court, our objective is to give a sensible and practical meaning to the provision as a whole so that it may be applied in future cases without difficulty. *Nationwide Mutual Insurance Co. v. Krongold*, Del.Supr., 318 A.2d 606, 609 (1974). In the absence of an affirmative indication from the trial judge, federal appellate courts do not presuppose that the trial court relied on evidence outside of the complaint when deciding a motion to dismiss under Rule 12(b). We consider that a salutary rule.

■ Here, the record is totally silent as to reliance by the Court of Chancery on the extrinsic documents to which the parties point. Thus, we confine our review to an examination of the trial court's disposition of defendants' motion to dismiss the plaintiffs' claims as derivative.

■ In reviewing this dismissal under Chancery Court Rule 12(b)(6), we must determine whether it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, plaintiffs would not be entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Fish Engineering Corp. v. Hutchinson*, Del.Supr., 162 A.2d 722, 724 (1960). Of course, our review is also limited to the well-pled facts contained in the Complaint which, viewing all inferences in a light most favorable to the plaintiff, we must take as true. *Haber v. Bell*, Del. Ch., 465 A.2d 353, 357 (1983). Conclusions, however, will not be accepted as true without specific allegations of fact to support them. *Id.*

### A.

The plaintiffs' principal complaint is that the trial court's characterization of their claims as derivative is wholly erroneous. The Amended Complaint, plaintiffs insist, demonstrates that Coca–Cola used its control of Tri–Star to implement a self-dealing combination adverse to the interests of the minority shareholders and violative of the entire fairness standard. More specifically, plaintiffs allege that Coca–Cola used its influence as controlling shareholder, and its domination of the self-dealing board of directors, to orchestrate a master plan fully knowing

that special injury would be suffered by the non-controlling stockholders of Tri–Star. The injury sustained, plaintiffs allege, is a selective diminution in the value of the minority stockholders' shares and a total evisceration of their right to make an informed vote on corporate affairs.[9]

According to defendants, plaintiffs lost standing as a result of the Sony–Tri–Star merger, since their accusations of self-dealing amount to no more than a complaint against corporate waste. *Lewis v. Anderson*, Del.Supr., 477 A.2d 1040, 1046–48 (1984). Because an injury suffered through waste of corporate assets falls equally upon all stockholders, defendants contend that any recovery may only be sought derivatively on behalf of the corporation injured. As for plaintiffs' charge that they were deprived of their right to vote, defendants allege that the result is the same because it is the lack of individual injury suffered, and not the injurious act, that determines if an action is personal or derivative.[10] As a result, defendants argue that the absence of averments of specific facts, showing how the alleged control, manipulation, or nondisclosure by Coca–Cola specifically injured plaintiffs or affected their contractual right to vote as stockholders, requires dismissal.

The trial court held that any injury resulting from the conduct of Coca–Cola or the Tri–Star board amounts to no more than a complaint against overpayment for the assets of the Entertainment Sector, and thus waste. The court reasoned that the diminution in the value of shares that may have resulted from the defendants' actions would have af-

fected all stockholders equally. Because the plaintiffs failed to articulate any individual injury suffered on account of the defendants' purportedly self-dealing Combination, the court concluded that when Tri–Star merged with Sony, plaintiffs lost their standing to pursue the solely derivative claims. Nevertheless, the court found that the plaintiffs asserted an individual claim for damages for violation of a controlling stockholder's duty of disclosure. In so ruling, the court expressed great skepticism that the plaintiffs would be able to prove any damages resulting from that claim.[11]

Upon full review of the pleadings, which incorporated the proxy materials and accompanying exhibits, we find that the trial court erred: (1) in concluding that the plaintiffs' Amended Complaint primarily alleged only derivative claims respecting the Combination, and (2) that plaintiffs' individual claims failed for lack of proof of damages. Taking the facts in a light most favorable to plaintiffs, as we are required to do under the appropriate standard of review, it is clear that plaintiffs alleged sufficient individual injury—unconditionally resulting from the defendants' manipulation of the Combination in a manner designed to dilute both the cash value and voting rights of the minority stockholders—for their claims to survive a motion to dismiss under Chancery Court Rule 12(b)(6). That conduct must be judged by the standards of entire fairness—fair price and fair dealing—articulated in *Weinberger v. UOP., Inc.*, Del.Supr., 457 A.2d 701, 710–13 (1983).

---

9. Plaintiffs also argue that the actual effect of the Combination on the class was the same as if a three-way exchange merger had occurred and thus, plaintiffs should have the same standing to challenge this "de facto merger" as minority stockholders would have in a regular merger. Plaintiffs ignore this Court's decision in *Heilbrunn v. Sun Chem. Corp.*, Del.Supr., 150 A.2d 755 (1959) (rejecting assertion of the doctrine of *de facto* merger by stockholders of the purchasing corporation). It is fatal to their cause. In *Heilbrunn*, this Court recognized "that no injury is inflicted upon the purchaser's stockholders where the corporation has simply acquired property and paid for it in shares of stock. The business of the purchaser will continue as before without the reorganization changing the essential nature of the corporation." *Id.* at 758.

10. Defendants also argue that the failure of the class representatives to participate in the vote to approve the Transfer Agreement should bar any latter-day complaint of nondisclosure. This argument is of no moment. Delaware law is settled that there is no reliance requirement in a claim for breach of a fiduciary duty of disclosure. *Cf. Smith v. VanGorkom*, Del.Supr., 488 A.2d 858 (1985); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983).

11. The trial court subsequently held that plaintiffs failed to allege sufficient damages to sustain the nondisclosure claims. The plaintiffs' appeal of this order is dealt with in Section III, *infra*.

**B.**

We begin with the plaintiffs' claim that the Combination fails to satisfy the standard of entire fairness required by *Weinberger.* If a controlling shareholder stands on both sides of a transaction, "the requirement of fairness is unflinching in its demand that the controlling stockholder establish the entire fairness of the undertaking sufficient to pass the careful scrutiny of the courts." *Id.* at 710; *Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 845 (1987); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 937 (1985). As alleged here, Coca-Cola, although not a majority shareholder, affirmatively attempted to dictate the destiny of Tri-Star. It therefore assumed a fiduciary duty to all Tri-Star shareholders. *Harriman v. E.I. DuPont De Nemours & Co.,* 372 F.Supp. 101, 106 (D.Del. 1974). *See also, Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1344 (1987).

Because these duties apply with equal or greater force in the context of a sale of assets, *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.,* Del.Ch., 120 A. 486, 491 (1923); *see also, Marks v. Wolfson,* Del.Ch., 188 A.2d 680, 685 (1963); *Allaun v. Consolidated Oil Co.,* Del.Ch., 147 A. 257, 260–261 (1929), any averment of individual harm caused by defendants would be sufficient to defeat summary dismissal of the action. Moreover, we have held that no proof of individual damage is required when a remedy in the nature of restitution is sought against a fiduciary. *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497, 503–504 (1981).

We begin with the character of Coca-Cola's fiduciary relationship with Tri-Star's minority stockholders. The trial court summarily disposed of the issue by concluding without elaboration that Coca-Cola was not a fiduciary at the time of the challenged disclosures, because it did not issue the proxy statement upon which the alleged disclosure violations are based. Plaintiffs argued that Coca-Cola effectively controlled Tri-Star, thereby establishing a fiduciary relationship. In the Amended Complaint, plaintiffs averred that Coca-Cola exercised effective control over Tri-Star by way of its majority holdings and through operation of the stockholder agreements with HBO, Technicolor, and Rank. Plaintiffs asserted that the shareholder agreements allowed Coca-Cola, in concert with HBO, to exercise control over 56.6%, an absolute majority, of Tri-Star's common stock. The plaintiffs also pointed to the provisions in the shareholders' agreement between Coca-Cola and HBO to each designate four nominees to the Tri-Star board and then to vote for each other's choices, as further evidence of control.

Other provisions preventing Coca-Cola and HBO from soliciting proxies in opposition to any recommendation by the Tri-Star board of directors, and prohibiting Tri-Star from entering into certain transactions with a principal stockholder without the consent of the other principal stockholders, were also set out in detail in the Amended Complaint. The plaintiffs further alleged that Coca-Cola's domination of the board was shown by the fact that four of Tri-Star's directors were senior executives of Coca-Cola or a Coca-Cola affiliate and three other directors owned substantial shares of Coca-Cola stock, thereby aligning their financial interests with Coca-Cola. As final proof of Coca-Cola's control of Tri-Star, plaintiffs recounted the fact that in the spring of 1987, when Tri-Star was undergoing financial difficulties, Coca-Cola infused $50 million to keep Tri-Star viable.

The defendants disclaim control by Coca-Cola. First, they argue that Coca-Cola's agreement not to vote its shares in favor of the Transfer Agreement, without a majority of the minority shares first approving it, defeats any notion of control. Defendants added that two of Coca-Cola's senior executives, who were also directors, did not participate in the vote, and that of the remaining eight [sic] directors who voted, the independence of four was not even questioned. Finally, defendants claimed that there is no evidence that Coca-Cola exercised undue influence over the preparation of the disclosure documents.

Contrary to the arguments of the defendants, Tri-Star's proxy statement reveals that it was seven, not eight, directors who approved the Transfer Agreement on September 30, 1987. Significantly, all seven of

the directors who voted in favor of the Combination had ties to Coca–Cola, or other relationships which on this limited record operate to deny them "certain presumptions that generally attach to the decisions of a board whose majority consists of truly outside independent directors." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 176 n. 3 (1986). Indeed, at oral argument defense counsel could not take serious issue with application of that proposition to all seven of those directors. Even a cursory review of defendants' own documents, describing the various relationships of these men, fully supports this conclusion.

Thus, under the heading of "Recommendation of the Board of Directors; *Potential Conflicts of Interest*" (A132) (emphasis added), Tri–Star's proxy materials reveal the nature of certain conflicts faced by the seven directors who unanimously approved the proposal on September 30, 1987.

At the time of his vote, Patrick M. Williamson was not only a Coca–Cola designee on Tri–Star's board, but a consultant to the former's wholly owned Entertainment Sector. He then became an executive vice president of the Entertainment Sector, and was to continue in a "senior management role" after the Combination. (A132).

Dan W. Lufkin was both a major stockholder of Coca–Cola and one of its nominees on Tri–Star's board. He also was a director of Allen & Company Incorporated, one of the investment banking firms that "participated in developing the terms of the Combination" and provided the Tri–Star board with a fairness opinion, charging over $5 million in fees and expenses. (A143). The close ties of Allen to Coca–Cola have previously been described, including the fact that Allen's chief executive officer was a Coca–Cola director and major stockholder. *See supra*, at 323. Both Mr. Lufkin and Herbert A. Allen, Allen & Company's CEO, were to serve on Tri–Star's board after the Combination. (A195, 197).

Victor A. Kaufman was Tri–Star's chief executive officer and the chairman of its board. Before that he was an executive vice president of Columbia and vice chairman of Columbia Pictures, a division of Columbia.

(A195). Moreover, Mr. Kaufman was to continue as a director, president and chief executive officer of the combined entity after the Combination (A201), and also was to participate in a 1988 non-qualified stock option program. (A132).

David A. Matalon was the president of Tri–Star, and one of its "principle executive officers." Along with Mr. Kaufman and others, he also was a member of Tri–Star's Management Policy Committee, which was designed to act as Tri–Star's "principle corporate executive steering body." (A200–01). Like Mr. Kaufman he was to continue in the employ of the combined entity after the Combination, and to participate in the 1988 non-qualified stock option program. (A132).

E. Thayer Bigelow, Jr. and Joseph J. Collins were senior officers of Time Incorporated and of its subsidiary, HBO. As the proxy materials noted, HBO had "significant commercial agreements with both Tri–Star and The Coca–Cola Company." (A132).

Finally, Judd A. Weinberg was a large Coca–Cola stockholder, who was to continue on the board of the combined entity after the Combination. (A132, 198).

Given the shadow of Coca–Cola's influence, in the context of a motion to dismiss it becomes impossible on this record to deny that Coca–Cola gave every appearance of dominating both Tri–Star's board and the Combination. Coca–Cola was indisputably the controlling stockholder of Tri–Star. By the shareholder agreements with HBO, Technicolor and Rank, its control was secure. Equally important, however, is the plaintiffs' assertion that the timing of the mailing to the stockholders of the proxy materials was an integral part of Coca–Cola's plan. Nowhere do defendants factually dispute Coca–Cola's potential influence on the proxy preparation process, as is implied by reason of the fact that all the members of the Tri–Star board, plus Allen and Company, had a vested personal interest in seeing that Coca–Cola's aims were met. Under all these circumstances, we cannot conclude at this stage, as the trial court did, that Coca–Cola had no fiduciary relationship to the minority.

## C.

▆ Having established that plaintiffs' averments are sufficient for present purposes to allege a fiduciary relationship between themselves and Coca–Cola, it remains to be determined if the plaintiffs suffered any individual harm as a result of the alleged breach of this duty. It is well settled that the test used to distinguish between derivative and individual harm is whether the plaintiff suffered "special injury." *Lipton v. News International, Plc.*, Del.Supr., 514 A.2d 1075, 1078 (1986); *Moran v. Household International, Inc.*, Del.Ch., 490 A.2d 1059, 1070, *aff'd*, Del. Supr., 500 A.2d 1346 (1985). A special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote. *Lipton*, 514 A.2d at 1078; *Rabkin v. Phillip A. Hunt Chemical Corp.*, Del.Ch., 547 A.2d 963, 968–69 (1986); *Moran*, 490 A.2d at 1070. Although it is true that claims of waste are derivative, a claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim. *Avacus Partners, L.P. v. Brian*, Del.Ch., C.A. No. 11001, Allen, C., slip op. at 6, 1990 WL 161909 (October 24, 1990); *cf. Condec Corporation v. Lunkenheimer Co.*, Del.Ch., 230 A.2d 769, 776 (1967).

In this case, the Amended Complaint seeks either rescission, restitution, or damages for the injuries suffered by the minority stockholders as a result of the implementation of the Combination. The injury sustained, the plaintiffs allege, is a loss manifested by both cash-value and voting power dilution. The harm accorded to cash-value dilution is the reduction in value of the minority stockholders' shares, determined by the liquidation value of each share both before and after effectuation of the Combination. Because plaintiffs essentially allege that Coca–Cola took newly issued shares in exchange for fraudulently inflated property of a far lesser value, the cash-out value of the minority stockholders' interest would have declined appreciably after execution of the Combination. Thus, the individual aspect of an injury inuring from cash-value dilution is quite different from one sustained by waste. A waste of corporate assets diminishes the value of all stockholders' interests equally, but the practical effect of cash-value dilution is to increase the value of the controlling stockholder's interest at the sole expense of the minority.

Plaintiffs also suffer harm by voting power dilution which, in essence, is no more than a relative diminution in the minority's proportionate influence over corporate affairs.[12] As a result of Coca–Cola's receipt of over 75 million shares, the minority stockholders' position went from 43.4% to less than 20% without any compensation. The proportionate interest of the majority, however, increased substantially after the Combination was given effect.

Of course, the controlling stockholder, Coca–Cola, suffered nothing. After consummation of the Combination, Coca–Cola realized absolute control of Tri–Star. Any diminution in the cash liquidation value of its shares, resulting from the post-merger writedown of assets, was totally offset by the windfall profits plaintiffs allege Coca–Cola accumulated from the Combination. This is not a case like *Lewis v. Anderson*, Del.Supr., 477 A.2d 1040, 1051 (1984), where the Court upheld dismissal of plaintiff stockholders' derivative claims following a merger. Instead, it is a case involving the right of the minority to compensation for harm caused them by a controlling stockholder who breached its duty of loyalty to the minority class. *Weinberger*, 457 A.2d at 714.

Distilling the Transfer Agreement to its bare essence, and taking the facts in a light most favorable to plaintiffs, it appears that after Coca–Cola depleted over $500 million of liquid assets from the Entertainment Sector, it then was able to effectively dispose of the remaining $765 million of unappraised Entertainment Sector assets in an exchange for

---

**12.** Voting power dilution is a harm distinct and separate from that suffered by the minority shareholders due to the alleged nondisclosures made by the defendants in their proxy materials. The harm from voting power dilution goes to the impact of an individual stockholder's vote, the latter harm goes to a stockholder's right to cast an *informed* vote.

between $900–$977 million of Tri–Star common stock.[13] Coca–Cola delayed writing down the value of the Entertainment Sector assets by some $200 million in order to preserve the net book value ratio necessary to guarantee the company an 80% controlling interest in Tri–Star. Under such circumstances serious issues of fairness arise. *Id.* at 711. After the Combination was implemented, the company was sold to Sony. This sale resulted in the class losing its standing to pursue those claims that alleged waste and thus, were solely derivative in nature.[14]

Putting aside the fact that only by a very detailed search of the proxy materials does one learn that from an accounting standpoint the transaction was treated as a purchase of Tri–Star by the Entertainment Sector for $291 million (A163, 172), no where will one find a clear statement of what the Entertainment Sector really paid for its 80% interest in Tri–Star. Thus, the asset write-down raises very serious questions of fairness, which include disclosure issues. *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1283 (1988); *Weinberger*, 457 A.2d at 711–13. As a result, it appears on this record that in structuring the Combination, Coca–Cola exchanged $745 million in assets, overvalued by $200 million, for Tri–Star stock worth over $900 million—an apparent profit to Coca–Cola of over $300 million accompanied by a diminution of the minority class' interest from 43.4% to less than 20%. Had all of this been fully disclosed to the minority *before* the transfer agreement was submitted for their approval, a reasonable person might suppose that the matter

would have been deemed material to the "total mix" of information and overwhelmingly defeated. *Rosenblatt*, 493 A.2d at 944–45. This has particular significance in view of the fact that Coca–Cola could not vote its shares in favor of the proposal unless it was first approved by a majority of the minority shares voting at the special stockholders meeting on December 15, 1987. (A139).

Nevertheless, defendants insist that even assuming that all of the above allegations were true, the diminution in the value of the shares held by the minority is a harm suffered by all stockholders equally, including Coca–Cola and the defendant directors of Tri–Star. The fallacy of this argument, however, is amply illustrated by scrutinizing Coca–Cola's course of conduct as a whole, rather than by evaluating its actions in isolation. Because it is the plan or scheme that is the basis of the plaintiffs' complaint, the focus properly rests on the *cumulative* impact of the Combination on the minority.

The plaintiffs claim to have suffered cash value dilution arising from Coca–Cola's allegedly fraudulent manipulation of the stockholder voting process to win approval of the Transfer Agreement. This point is of considerable significance. Had the plaintiffs been fully informed of all material facts relating to this transaction, the required number of votes may not have been obtained and, under the terms of the agreement, Coca–Cola could not vote its shares to guarantee approval of the Transfer Agreement.[15] Thus, by its alleged breaches of the duty of disclosure,

---

**13.** At oral argument, Coca–Cola's counsel conceded that the value of the Tri–Star shares at the time of the Combination was $12 to $13 per share and that the net book value of the Entertainment Sector was $765 million before the write-down. He did not adequately explain, however, why the total purchase price of Tri–Star by the Entertainment Sector was reported to be $291 million.

**14.** Had Coca–Cola used its effective control of Tri–Star to merge with Sony in order to deprive Tri–Star minority stockholders of their claims, then such action would constitute fraud sufficient to sustain even derivative claims under an exception to the contemporaneous ownership requirement. *Lewis v. Anderson*, Del.Supr., 477 A.2d 1040, 1046 n. 10 (1984). At oral argument,

however, plaintiffs' counsel conceded their claims did not fall under the exception provided for in *Lewis v. Anderson.* Hence, that part of Count I alleging corporate waste and the breach of contract claim in Count IV of the Amended Complaint were properly dismissed.

**15.** The Vice Chancellor agreed that plaintiffs' non-disclosure claims amounted to an individual injury, but later held plaintiffs failed to adduce sufficient proof of damage to sustain their claim. Although for other reasons we disagree with the Vice Chancellor on the issue of damages as discussed in Section III, *infra*, we emphasize that the disclosure violations cannot be viewed in isolation from the defendants' total course of conduct in determining whether the plaintiffs suffered individual injury.

Coca–Cola materially and adversely affected the minority class' right to cast an informed vote. Such conduct, if true, is an improper interference with exercise of the franchise. It is a unique special harm to each un-informed shareholder for which the wrong-doer is answerable in damages. *Weinberger,* 457 A.2d at 714.

It is equally relevant that plaintiffs, and not Coca–Cola, suffered a proportionate loss of voting power resulting from the newly authorized issuance of 75 million shares un-der the Combination. The impact of this loss on voting power of the minority was fully realized at the time of the Sony merger. Coca–Cola's newly acquired shares gave it total voting control of Tri–Star and the mi-nority became powerless to prevent the merger. The fact that Coca–Cola spread nearly half of its newly acquired common stock among its own stockholders as a special dividend does not alter the fact that the power of Tri–Star's minority stockholders to oppose the merger was diluted to the point of virtual oblivion. Coca–Cola effectively se-cured for itself the ability to terminate any derivative claims that may have followed from its self-interested effectuation of the Combination. Minority stockholders were left only with the prospects of bringing an appraisal action against Sony that would leave the alleged principal wrongdoer, Coca–Cola, free from liability.

Hence, the cumulative effect of these indi-vidual wrongs was to diminish the value of the minority interests in a way that would ultimately result in a reduction in the fair value of their shares at the time of the merger. When the end of Coca–Cola's scheme was realized with the consummation of the second step of the Sony merger, it appears on this abbreviated record that the minority were cashed out of their Tri–Star interests for an amount far less than what they would have received had Tri–Star been liquidated immediately prior to the Combina-tion. Again, on this record it appears that Coca–Cola suffered no similar loss, but reap-ed a substantial profit guaranteed through selective retention, and creative valuation of, the Entertainment Sector assets.

### D.

In *Rabkin v. Phillip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985), we recognized the inadequacy of an appraisal where the alleged wrongdoer (here Coca–Cola) is not a party to the appraisal proceed-ing and thus, not personally accountable for its actions. That is particularly so in cases of overreaching and unfair dealing which are not addressed by an appraisal. *Id.* at 1104. The circumstances complained of here are not dissimilar to those in *Rabkin. Id.* at 1103–04. There, we recognized that the tim-ing, structure, negotiation and disclosure of a cash-out merger all had a bearing on proce-dural fairness. *Id.* at 1104–05. The require-ment of fairness is unflinching in its demand that one standing on both sides of a transac-tion, (as Coca–Cola and the seven Tri–Star directors appear to have done here), has the burden of establishing entire fairness. *Id.* at 1106. Because the controlling stockholder in *Rabkin* had unfairly manipulated the trans-action to deprive the minority of what it was equally entitled to, we reversed the dismissal with instructions that the trial court more closely focus on the entire fairness standard. *Id.* at 1107. Thus, we reaffirmed the funda-mental principle that inequitable conduct will not be protected merely because it is legal. *Id.; Schnell v. Chris–Craft Industries, Inc.,* Del.Supr., 285 A.2d 437, 439 (1971).

The principle of *Rabkin* is directly applica-ble here. At this stage we must take it as true that Coca–Cola's systematic course of conduct caused plaintiffs injury of the type alleged. A controlling stockholder's unremit-ting effort to circumvent *Weinberger,* and utilize control to the detriment of the minori-ty, will not pass muster. Where, as here, it is sufficiently alleged that the effect of the controlling stockholder's self-serving manipu-lation of corporate affairs causes a singular economic injury to minority interests alone, the minority have stated a cause of action for "special injury" to survive a motion to dis-miss. *Weinberger,* 457 A.2d at 714. More-over plaintiffs' averments are sufficient re-specting Coca–Cola's knowing participation in a breach of the directors' fiduciary duties to subject it to liability under *Macmillan,* 559 A.2d at 1283, 1284 n. 33; *Ivanhoe Part-*

*ners, Corp.,* 535 A.2d at 1344, and *Penn Mart Realty Co. v. Becker,* Del.Ch., 298 A.2d 349, 351 (1972).

As we recently stated in *Cede:* "A breach of either the duty of loyalty or the duty of care rebuts the presumption that the directors have acted in the best interests of the shareholders, and requires the directors to prove that the transaction was entirely fair." *Cede,* 634 A.2d at 371; *Smith v. VanGorkom,* Del.Supr., 488 A.2d 858, 893 (1985); *Shamrock Holdings, Inc. v. Polaroid,* Del.Ch., 559 A.2d 257, 271 (1989). Here, taken as true for present purposes, the record is permeated with apparent breaches of the duty of loyalty. In all respects this clearly shifts the burden to the defendants. As we stated in *Weinberger:*

> There is no 'safe harbor' for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.... The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts. (Citations omitted).

*Weinberger,* 457 A.2d at 710.

■ The "measure of any recoverable loss by [the minority] under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings. ... '[A]ny form of equitable and monetary relief ... may be appropriate, including rescissory damages.'" *Cede,* 634 A.2d at 371; *Weinberger,* 457 A.2d at 714. Clearly, the Court of Chancery may incorporate elements of rescissory damages into its determination of fair price if it considers such elements: (1) susceptible to proof; and (2) appropriate under the circumstances. *Weinberger,* 457 A.2d at 714; *Cede,* 634 A.2d at 371.

Accordingly, the judgment of the Court of Chancery dismissing Counts I, II, V, and VII of the plaintiffs' Amended Complaint, but excluding those parts alleging waste of corporate assets, will be reversed.

## III.

■ We next turn to plaintiffs' contention that the trial court erred when it determined that proof of damages are a required element in a suit for breach of the duty of disclosure and thus, the plaintiffs' failure to adduce sufficient evidence of damage merited dismissal of their claim. The trial court held that proof of special damages was required in a suit seeking compensatory damages for a breach of the fiduciary duty of disclosure. Ruling that the plaintiffs had failed to adduce sufficient evidence of their damages, the Vice–Chancellor granted defendants' summary judgment motion as a matter of law, under *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 60 (1991). As *Cede* observes, however, that is not the law in the context of a fairness case. *Cede,* 634 A.2d at 370–371.

■ Because our review of a trial court's grant of summary judgment in favor of the defendant is *de novo* we examine all legal issues to determine whether the trial court erred in formulating or applying legal precepts. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 81 (1992). In Delaware existing law and policy have evolved into a virtual *per se* rule of damages for breach of the fiduciary duty of disclosure. In *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642, Brown, C., slip op., 1985 WL 11546 (Jan. 30, 1985), *aff'd,* Del. Supr., 497 A.2d 792 (1985), the court awarded damages of $1.00 per share because of evidence that, if the stockholders had voted down the proposed cash-out merger on complete disclosure, the majority stockholder would have acquired plaintiffs' shares at $22 instead of $21 per share. *Id.,* slip op. at 23–35. In reaching this decision, the former Chancellor held that because equity will not suffer a wrong without a remedy, the minority should be compensated for the wrong done to them even though a damage figure cannot be ascertained from a comparison of selected stock values with any degree of precision. *Id.,* slip op. at 20–21.

In *Smith v. Shell Petroleum, Inc.,* Del.Ch., C.A. No. 8395, Hartnett, V.C., slip op., 1990

WL 186446 (Nov. 26, 1990), *aff'd,* Del.Supr., 606 A.2d 112 (1992), Vice Chancellor Hartnett held that an award of monetary damages was justified to remedy an injury arising from the failure to disclose oil and gas reserves that induced stockholders to accept an inadequate price in a cash out merger, because the deprivation of the stockholders' right to make an informed decision provided ample proof of the certainty of their claim. *Id.,* slip op. at 11. And in *Gaffin v. Teledyne, Inc.,* Del.Ch., C.A. No. 5786, Hartnett, V.C., slip op., 1990 WL 195914 (Dec. 4, 1990), the court awarded damages of $1.00 per share only after first holding that plaintiffs had shown an injury from the omission even though they were unable to demonstrate the amount of damages with certainty.[16] *Id.,* slip op. at 47.

In all of these cases, the courts recognized some value associated with a stockholder's right to make an informed decision on corporate affairs. That issue is squarely raised here. But for the nondisclosure of Coca-Cola's alleged scheme to divest itself of the overvalued and ailing Entertainment Sector on Tri-Star, to improve Coca-Cola's own corporate balance sheet, the plaintiff class may very well have voted against the Transfer Agreement, effectively killing the agreement.[17] Thus, the alleged loss suffered by the plaintiffs here is no different than that suffered by the plaintiffs in *Weinberger, Gaffin* or *Smith*—in all three cases the nondisclosure purportedly led to a diminution in the value of the plaintiffs' shares. Yet, none of those cases required the plaintiffs to prove damages at the pleading stage as an element of the *prima facie* case for breach of the fiduciary duty of disclosure.

Although it is clear that claims for common law fraud, misrepresentation, or equitable fraud do require plaintiffs to show quantifiable damage, *see Nicolet, Inc. v. Nutt,* Del. Supr., 525 A.2d 146, 149 (1987), the issues before us relate to breach of fiduciary duty, not fraud. Recently we held that damages need not always be proven in that context:

> [T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity.

*Oberly v. Kirby,* Del.Supr., 592 A.2d 445, 463 (1991). The distinction we noted in *Oberly* explains why no Delaware court has extended the damage rule to actions for breach of the duty of loyalty, which may embrace disclosure violations of the type alleged here.[18]

### IV.

■ Finally, we consider whether the trial court properly determined that plaintiffs' Article Sixth claim in Count III was moot. Although plaintiffs concede that the elimination of the challenged Article from Tri-Star's Certificate of Incorporation during the merger with Sony rendered it moot, they insist that the failure to separate the vote on the amendments from the vote for the Combination poisoned the entire voting process and thus, works to invalidate the Combination along with Article Sixth. Defendants contend that the failure of one provision has no effect on other matters voted on because the remedy for an invalid charter provision is refusal to enforce it, not setting aside the whole charter, much less the Combination. *See State ex rel. Cochran v. Penn-Beaver Oil Co.,* Del.Supr., 143 A. 257, 259 (1926).

---

**16.** In *Gaffin v. Teledyne, Inc.,* Del.Supr., 611 A.2d 467 (1992), this Court questioned the basis for awarding one dollar per share in damages. Nevertheless, we affirmed for failure to cross-appeal on the issue. *Id.* at 476.

**17.** According to the defendant's own proxy statement, 24.4% of the disinterested shares had to be voted in favor of the Combination in order to secure its approval.

**18.** This does not suggest, however, that the Court approves the means by which plaintiffs have sought to establish the measure of their damages. If plaintiffs seek more than nominal damages arising out of their claim for breach of the fiduciary duty of disclosure, the Court would expect that plaintiffs' present hypothetical estimates will give way to the more generally accepted practice of offering expert testimony on the amount of damages actually suffered by the class.

The trial court held that the fact that the stockholders were not allowed to vote separately on Article Sixth did not require a determination of, and indeed is logically unrelated to, the validity of that Article. Nonetheless, plaintiffs rely on *American Pacific Corp. v. Superfood Services, Inc.*, Del.Ch., 8 Del.J.Corp.L. 320, Longobardi, V.C., 1982 WL 8767 (December 6, 1982), for the proposition that the invalidity of one provision may require the Court to void the vote on the other provisions passed in the same motion. But plaintiffs' reliance on *American Pacific Corp.* is misplaced. That case involved a proxy statement which inaccurately and misleadingly implied that the various proposals could be approved or rejected separately, when in fact there was no way to cast a separate vote. *American Pacific Corp.*, 8 Del.J.Corp.L. at 325. Hence, the court enjoined the vote in order to permit corrective disclosure. *Id.* at 327. In the present case, however, there was full disclosure of the provisions of Article Sixth and the fact that a single vote would be held to approve all of the proposed amendments and the Combination. *American Pacific Corp.*, therefore, is inapplicable. The plaintiffs have no support in law or reason to advance their claim that the alleged invalidity of Article Sixth has any relevance to the validity of the Combination. In our opinion the challenge to Article Sixth was rendered moot when the provision was eliminated by the Sony merger. We affirm the trial court's dismissal of Count III.

The judgment of the Court of Chancery dismissing Counts I, II, V and VII of the Amended Complaint, excluding those parts alleging corporate waste, are REVERSED. In all other respects the judgment of the Court of Chancery is AFFIRMED.