# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TERRAFORM POWER, INC. | ) | CONSOLIDATED |
| STOCKHOLDERS LITIGATION | ) | C.A. No. 2019-0757-SG |

## MEMORANDUM OPINION

Date Submitted: July 16, 2020
Date Decided: October 30, 2020

Ned Weinberger, Derrick Farrell, and Mark Richardson, of LABATON SUCHAROW LLP, Wilmington, Delaware; Peter B. Andrews, Craig J. Springer, and Davis M. Sborz, of ANDREWS & SPRINGER LLC, Wilmington Delaware; OF COUNSEL: Jeremy S. Friedman and David F.E. Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; Steven J. Purcell, Douglas E. Julie, Robert H. Lefkowitz, and Kaitlyn T. Devenyns, of PURCELL JULIE & LEFKOWITZ LLP, New York, New York, *Attorneys for Lead Plaintiffs City of Dearborn Police and Fire Revised Retirement System (Chapter 23) and Martin Rosson.*

Kevin G. Abrams, Eric A. Veres, and Stephen C. Childs, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: John A. Neuwirth, Stefania D. Venezia, and Amanda K. Pooler, of WEIL, GOTSHAL & MANGES LLP, New York, New York, *Attorneys for Defendants Brookfield Asset Management Inc., Orion US Holdings 1 L.P., Brookfield BRP Holdings (Canada) Inc., Brian Lawson, Harry Goldgut, Richard Legault, Sachin Shah, and John Stinebaugh.*

Brian C. Ralston, Seth R. Tangman, and Caneel Radinson-Blasucci, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Daniel M. Sullivan, of HOLWELL SHUSTER & GOLDBERG LLP, New York, New York, *Attorneys for Nominal Defendant TerraForm Power, Inc.*

GLASSCOCK, Vice Chancellor

This matter involves a purported direct action by stockholders against the corporate controller and certain directors for breach of fiduciary duty. The Plaintiffs allege that the controller caused the entity to issue it stock for inadequate value, diluting both the financial and voting interest of the minority stockholders. Although the Plaintiffs initially asserted both direct and derivative claims, they subsequently ceased to be stockholders of the entity after the company was acquired in a merger. The merger ended any viable derivative claims, leaving the Plaintiffs with only their direct claims to pursue. Unlike derivative claims, a merger does not terminate a plaintiff's standing to pursue direct claims. Therefore, any direct claims survive the merger.

The Defendants have moved to dismiss for lack of standing, arguing that dilution claims are quintessential derivative claims that belong to the corporation under the standard articulated in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[1] The Plaintiffs counter that their claims are dual natured under the more specific rubric established by *Gentile v. Rossette*, and that their direct claims thus persist.[2]

The facts of this case are strikingly similar to those of *Gentile*. The Defendants do not dispute this. Instead, because *Gentile* has been both criticized and

---

[1] *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).
[2] *See Gentile v. Rossette*, 906 A.2d 91 (Del. 2006).

applied narrowly in a number of judicial opinions, they urge me to disregard it as precedent.

It may be tempting for a bench judge to think that a common law that is composed solely of his best judgement would itself be the perfect expression of the law. Fear of hubris and its condign results should dissuade any judge from such an error. More fundamentally, the value of the common law is that it provides for incremental change only, so that decision makers have a sense of certainty and predictability in taking actions under its framework. This value requires a careful balance. Prior decisions by those at the same judicial level, on the same facts, have strong persuasive value, and a judge should disregard them only when convinced that the prior conclusions of her colleague were erroneous. Prior on-point decisions of higher tribunals, by contrast, are controlling. If a plaintiff is to prevail against such prior case law, then, it must be via appeal.

This principle of stare decisis is the balance by which our common-law system enables flexibility without sacrificing predictability. Here, *Gentile* is the controlling precedent, under which I find that the Plaintiffs have adequately pled a direct claim, and the Defendants' Motion to Dismiss must be denied.

I amplify my reasoning, below.

# I. BACKGROUND[3]

### A. The Parties

Nominal Defendant TerraForm Power, Inc. ("TerraForm") is a Delaware corporation headquartered in New York.[4]  TerraForm is a publicly traded company that acquires, owns, and operates solar and wind assets in North America and Western Europe.[5]

Defendant Brookfield Asset Management, Inc. ("Brookfield") is a Canadian corporation headquartered in Toronto.[6]  Brookfield is an alternative asset manager that primarily conducts business through direct and indirect subsidiaries.[7]  At the time the Complaint was filed, Brookfield and its affiliates beneficially owned 61.5% of TerraForm.[8]  Pursuant to TerraForm's then-operative Certificate of Incorporation (the "Charter"), Brookfield also had the power to designate four members of Brookfield's senior management to TerraForm's Board of Directors.[9]

---

[3] The facts, except where otherwise noted, are drawn from the designated operative Verified Stockholder Derivative and Class Action Complaint, C.A. No. 2020-0050-SG, Dkt. No. 1 (the "Complaint" or "Compl."), and are presumed true for the purposes of evaluating the Defendants' Motion to Dismiss.  *See* Stip. and Order of Consolidation and Appointment of Lead Pls. and Co-Lead Counsel ¶ 14, Dkt. No. 19.

[4] Compl. ¶ 13.

[5] *Id.*  Terraform's common stock trades on the NASDAQ under the ticker "TERP."  *Id.*

[6] *Id.* ¶ 14.

[7] *Id.* ¶¶ 14–15.

[8] *Id.* ¶ 14.

[9] *Id.* ¶ 2.

Defendant Orion US Holdings 1 L.P. ("Orion Holdings") is a Delaware limited partnership and an affiliate of Brookfield.[10] Orion Holdings is one of Brookfield's affiliates through which Brookfield has held beneficial voting and dispositive power over Brookfield's TerraForm shares.[11]

Defendant Brookfield BRP Holdings (Canada) Inc. ("BRP Holdings") is a Canadian corporation and an affiliate of Brookfield.[12] BRP Holdings' sole purpose appears to be holding stock in TerraForm.[13]

Defendant Brian Lawson is a director of TerraForm and Senior Managing Partner and Chief Financial Officer ("CFO") of Brookfield.[14]

Defendant Harry Goldgut is a director of TerraForm and Vice Chair of Brookfield's Renewable Group and Brookfield's Infrastructure Group.[15]

Defendant Richard Legault is a director of TerraForm and Vice Chairman of Brookfield.[16]

---

[10] *Id.* ¶ 17.
[11] *Id.* ¶ 14 n.5.
[12] *Id.* ¶ 18.
[13] *Id.*
[14] *Id.* ¶ 19.
[15] *Id.* ¶ 20.
[16] *Id.* ¶ 21.

Defendant Sachin Shah is a director of TerraForm and a Managing Partner of Brookfield.[17] Shah also serves as Chief Executive Officer ("CEO") of Brookfield Renewable Partners and BRP Holdings.[18]

Defendant John Stinebaugh is TerraForm's CEO.[19] Stinebaugh was appointed as TerraForm's CEO by Brookfield and is employed as a Managing Partner of Brookfield.[20] Stinebaugh receives no direct compensation from TerraForm for his services as CEO and instead receives his compensation solely from Brookfield.[21]

Plaintiff City of Dearborn Police and Fire Revised Retirement System (Chapter 23) ("City of Dearborn") has continuously owned shares of TerraForm Class A common stock at all times relevant to this action.[22]

Plaintiff Martin Rosson has continuously owned shares of TerraForm Class A common stock since January 2018.[23]

---

[17] *Id.* ¶ 22.
[18] *Id.*
[19] *Id.* ¶ 23.
[20] *Id.*
[21] *Id.*
[22] *Id.* ¶ 12.
[23] Verified Stockholder Derivative and Class Action Complaint for Breach of Fiduciary Duties ¶ 10, C.A. No. 2019-0757, Dkt. No. 1.

*B. Brookfield Becomes TerraForm's Controlling Stockholder; TerraForm's Governance*

TerraForm was formed on January 15, 2014 as a wholly-owned indirect subsidiary of SunEdison, Inc. ("SunEdison").[24] TerraForm completed an initial public offering ("IPO") on July 23, 2014.[25] Subsequent to its IPO, SunEdison was TerraForm's controlling stockholder with 91% of the combined voting power of Terraform.[26] In April 2016, SunEdison filed for production under Chapter 11 of the United States Bankruptcy Code.[27] Because SunEdison was not performing certain obligations (including management and administrative services) owed to TerraForm, TerraForm initiated a process to explore and evaluate strategic alternatives.[28]

Brookfield ultimately agreed to purchase a controlling interest in Terraform (the "Merger").[29] As a result of the Merger, Brookfield became TerraForm's controlling stockholder, holding through its affiliates 51% of TerraForm's outstanding common stock.[30] The Merger was effectuated by a Merger and Sponsorship Transaction Agreement (the "Transaction Agreement") entered into by TerraForm and two Brookfield affiliates: Orion Holdings and BRE TERP Holdings,

---

[24] Compl. ¶ 25. TerraForm's original name was SunEdison Yieldco, Inc.—the company's name was changed to TerraForm on May 22, 2014. *Id.*
[25] *Id.* ¶ 26.
[26] *Id.* ¶ 27.
[27] *Id.* ¶ 29.
[28] *Id.*
[29] *Id.* ¶ 32.
[30] *Id.*

6

Inc. ("Merger Sub").[31] In connection with the Merger, TerraForm eliminated its previous share structure—which included three classes of stock—and instead now has only a single class of stock: Class A, which is entitled to one vote per share.[32]

Brookfield and several of its affiliates, including Orion Holdings, also entered into several sponsorship arrangements with Terraform.[33] Pursuant to a Master Services Agreement between TerraForm, Brookfield, and several Brookfield affiliates (the "Master Services Agreement"), Brookfield agreed to provide certain management and administrative services to TerraForm.[34] A Governance Agreement between TerraForm and Brookfield (through Orion Holdings) (the "Governance Agreement") fixed certain rights and obligations of TerraForm and Brookfield related to TerraForm's governance.[35]

The Master Services Agreement and Governance Agreement granted Brookfield the exclusive power to appoint TerraForm's CEO, CFO, and General Counsel.[36] Following the Merger, Brookfield appointed Defendant Stinebaugh as TerraForm's CEO, a position he currently retains.[37] Brookfield also appointed

---

[31] *Id.* ¶ 30.
[32] *Id.* ¶ 31.
[33] *Id.* ¶ 33.
[34] *Id.* ¶ 34.
[35] *Id.*
[36] *Id.* ¶ 35.
[37] *Id.* ¶ 36.

TerraForm's CFO and General Counsel, both of whom, along with Stinebaugh, were Brookfield employees.[38]

Also in connection with the Merger, Terraform amended its Charter; fixing the size of TerraForm's Board of Directors (the "Board") to seven members.[39] The amended Charter provided that, for so long as Brookfield remains TerraForm's controlling stockholder under stock exchange listing rules, Brookfield will have the right to designate four of the seven Board members.[40] Upon the consummation of the Merger, Brookfield appointed four members of its senior management to the Board—Defendants Lawson, Goldgut, Legault, and Shah.[41]

Pursuant to TerraForm's Charter, the remaining three directors of TerraForm must be "independent" under SEC and NASDAQ rules and regulations.[42] The Governance Agreement requires that TerraForm have a Conflicts Committee composed of the three non-Brookfield directors (the "Conflicts Committee").[43] The Conflicts Committee is responsible for reviewing and approving material transactions and matters in which a conflict of interest exists between TerraForm and Brookfield (and its affiliates).[44] Since May 23, 2018, Mark McFarland,

---

[38] *Id.*
[39] *Id.* ¶ 37.
[40] *Id.*
[41] *Id.* ¶ 38.
[42] *Id.* ¶ 39.
[43] *Id.* ¶ 40.
[44] *Id.*

Christian S. Fong, and Carol Burke have comprised the Conflicts Committee.[45]

McFarland was appointed as a non-Brookfield designee, but Brookfield "requested that [TerraForm] consider appointing" McFarland to the Board following the Merger.[46]

TerraForm acknowledges that it is a "'controlled company,' controlled by Brookfield and its affiliates, whose interest in [TerraForm's] business may be different from [TerraForm's] or other holders of [TerraForm's] Class A common stock."[47]

### C. TerraForm Determines to Acquire Saeta Yield S.A.; Planned Equity Offering

In or around January 2018, Brookfield approached TerraForm regarding an opportunity to acquire Saeta Yield, S.A. ("Saeta"), a publicly-traded Spanish yieldco with 1.0+ gigawatts of contracted onshore wind and solar assets for $1.2 billion (the "Saeta Acquisition").[48]  Saeta had a high-quality operating portfolio and represented an attractive acquisition target in line with TerraForm's growth mandate.[49]

---

[45] *Id.* ¶ 41.
[46] *Id.* ¶ 39.
[47] *Id.* ¶ 43.
[48] *Id.* ¶ 44.  A "yieldco" is a company formed to own operating assets that produce a predictable cash flow, primarily through long-term contracts.  *Id*. ¶ 3 n.2.
[49] *Id.* ¶ 45.

9

TerraForm had the debt capacity to fund most—if not all—of the $1.2 billion price of the Saeta Acquisition.[50] Notwithstanding this debt capacity, Brookfield steered TerraForm towards funding a significant portion of the purchase price with a backstopped equity offering.[51] On January 23, 2018 Brookfield and TerraForm informed the Conflicts Committee that, in addition to funding the Saeta Acquisition with debt, TerraForm would raise approximately $600–$700 million of equity in the public markets.[52] Brookfield indicated that in addition to participating up to it's *pro rata* portion of the equity offering—that is, 51%—it was willing to backstop part of the equity offering.[53]

The Conflicts Committee initially did not retain its own financial advisor in connection with the proposed equity offering and instead relied on the advice of Barclays, who was serving as TerraForm's financial advisor.[54] Barclays had a history of advising Brookfield and its affiliates on significant transactions, and, additionally, Brookfield owns Barclays' London headquarters and Barclays is Brookfield's third-largest tenant.[55] Board and Conflict Committee meeting minutes

---

[50] *Id.* ¶ 52.
[51] *Id.* ¶ 53.
[52] *Id.* ¶ 54.
[53] *Id.* TerraForm's management recommended that Brookfield receive a 2.625% upfront free for providing the equity back-stop. *Id.*
[54] *Id.* ¶ 55.
[55] *Id.* ¶ 56.

do not reflect any discussion, deliberation, or questioning concerning Barclays's affiliation with Brookfield.[56]

The Conflicts Committee met on January 26, 2018 to discuss a proposed $650 million equity offering backstopped in part by Brookfield (the "Equity Offering").[57] The Conflicts Committee tasked Committee member Fong with seeking additional detail as to the reasons why a funding plan with more debt and less equity was not as advantageous to TerraForm as the proposed funding plan—Fong was to seek such information from TerraForm's CEO Stinebaugh.[58]

The Conflicts Committee met again on January 29, 2018 at which time it determined that the proposed backstop was advisable and in TerraForm's best interests.[59] In forming this conclusion the Conflicts Committee relied on TerraForm's management and Brookfield for advice.[60] The Conflicts Committee still had not engaged or consulted with a financial advisor.[61]

As of February 6, 2018 the funding plan for the Saeta Acquisition had been updated to reduce the Equity Offering from $650 million to $400 million due to, among other things, recent stock market volatility.[62] Brookfield offered to backstop

---

[56] *Id.*
[57] *Id.* ¶ 57.
[58] *Id.*
[59] *Id.* ¶ 58.
[60] *Id.*
[61] *Id.*
[62] *Id.* ¶ 60.

11

the full amount of the anticipated $400 million Equity Offering for no fee, so long as the offering price was equal to the five-day volume weighted average price ending the trading day prior to TerraForm's announcement of the Saeta Acquisition.[63] At a meeting that day the Conflicts Committee approved the equity backstop on these terms, as documented in a support agreement between TerraForm and Brookfield (the "Support Agreement").[64]

The Support Agreement provided that TerraForm's funding of the Saeta Acquisition via tender offer might include an equity offering of TerraForm common stock "on a pro rata basis to existing TerraForm stockholders of up to approximately $400 million."[65] Brookfield agreed in the Support Agreement to backstop the Equity Offering if the offering price equaled TerraForm's five-day weighted average price ending February 6, 2018, which was $10.66 per share.[66] Brookfield's backstop obligations were subject to successful commencement of the tender offer under applicable Spanish law and to prior effectiveness of the necessary TerraForm registration statement, if required.[67] TerraForm and Brookfield agreed that the pricing, size, and timing of the Equity Offering—including the decision to use the

---

[63] *Id.*
[64] *Id.* ¶ 61.
[65] *Id.* ¶ 62.
[66] *Id.* ¶ 63.
[67] *Id.* ¶ 64.

backstop—would be subject to prior review and approval of the Conflicts Committee, together with any other necessary approvals.[68] Finally, it was agreed in the Support Agreement that TerraForm and the Conflicts Committee would retain an independent financial advisor—meaning independent from Brookfield—to provide advice regarding the Equity Offering.[69]

On February 7, 2018, TerraForm announced that it intended to launch a tender offer to acquire 100% of Saeta's outstanding shares for an aggregate purchase price of approximately $1.2 billion (the "Tender Offer") and that TerraForm expected to fund the Tender Offer by (1) conducting a $400 million equity issuance of TerraForm's Class A common stock (the Equity Offering) and (2) providing the remaining $800 million using its available liquidity.[70] On May 3, 2018, TerraForm commenced the Tender Offer.[71]

TerraForm had filed a preliminary Form S-1 registration statement with the Securities and Exchange Commission ("SEC") on March 19, 2018 in connection with the planned public offering of $400 million in TerraForm Class A Common stock.[72] On May 10, 2018 TerraForm filed its definitive proxy statement with the

---

[68] *Id.* ¶ 65. The Complaint notes that "[t]he Support Agreement did not 'require TerraForm to make or complete any [e]quity [o]ffering' nor 'commit TerraForm to an [e]quity [o]ffering at any particular price, of any particular size or at any particular time.'" *Id.*

[69] *Id.* ¶ 66.

[70] *Id.* ¶ 67.

[71] *Id.* ¶ 69.

[72] *Id.* ¶ 68.

SEC seeking stockholder approval for the issuance of up to 61 million shares of Class A Common stock in connection with the planned Equity Offering.[73] TerraForm's stockholders approved the share issuance on May 23, 2018 at TerraForm's annual stockholder meeting.[74]

### D. TerraForm Enters Into Private Placement with Brookfield

Immediately after TerraForm's May 23, 2018 annual meeting, the Board met to discuss the Equity Offering and backstop.[75] TerraForm's CEO Stinebaugh proposed TerraForm raise $650 million—rather than $400 million—through the sale of equity because "the market expect[ed] a $650 million total equity offering and that the impact to the returns on the Saeta transaction would not be material."[76] TerraForm director Shah—also a Brookfield appointee—indicated that Brookfield would be prepared to increase the size of the backstop from $400 million back up to $650 million.[77] Stinebaugh then proposed that if the Equity Offering presented too much market risk, the full amount be offered to Brookfield through a private placement at $10.66 per share.[78] At the conclusion of the meeting, TerraForm's

---

[73] *Id.* ¶ 70.
[74] *Id.* ¶ 71.
[75] *Id.* ¶ 73.
[76] *Id.*
[77] *Id.* ¶ 74.
[78] *Id.*

Board determined that the Conflicts Committee should consider Brookfield's proposal to increase the size of the backstop to $650 million.[79]

At the conclusion of the full Board meeting on May 23, 2018, the Conflicts Committee met to discuss the information that had just been presented.[80] There was no discussion of the proposed private placement and only a discussion of the proposed increase to the equity offering (to $650 million) and commensurate increase in Brookfield's backstop.[81]

That same day, the Conflicts Committee had its first meeting with an independent financial advisor, Greentech Capital Advisors, LLC ("Greentech").[82] The Conflict Committee's minutes do not indicate when the Conflicts Committee determined to retain Greentech, why the Conflicts Committee chose to retain Greentech specifically, or whether the Conflicts Committee considered retaining other financial advisors.[83] Greentech's written presentation to the Conflicts Committee contemplated that Brookfield would backstop the full $650 million even though, according to meeting minutes, Brookfield first suggested the increased backstop only a few hours earlier.[84] Greentech's materials do not address or provide

---

[79] *Id.* ¶ 76.
[80] *Id.* ¶ 77.
[81] *Id.*
[82] *Id.* ¶ 78.
[83] *Id.* ¶ 77.
[84] *Id.* ¶ 78.

advice related to the fairness of a private placement with Brookfield.[85] At the conclusion of the meeting, the Conflicts Committee directed Greentech to "coordinate" with Barclays.[86]

The Conflicts Committee met again the following day—May 24, 2018—and Greentech reviewed with the Conflicts Committee the materials provided the previous day.[87] The Greentech materials remarked that "a $650 million offering would be less favorable to [TerraForm] than a $400 million offering because it would 'significantly reduce returns' and 'reduce the accretion from Saeta.'"[88] The materials continued that the precedent transactions for the Equity Offering implied a total discount of 4%–7% which "would lead to a discounted stock price lower than Brookfield's backstop of $10.66."[89] Nonetheless, Greentech advised the Conflicts Committee that it would be "difficult to predict the price at which the Equity Offering could be executed (and whether it could be executed at a price above [$10.66])."[90] Greentech also noted that a backstop covering the full amount of the Equity Offering "was very beneficial."[91] As with the previous day's meeting, there

---

[85] *Id.*
[86] *Id.*
[87] *Id.* ¶ 79.
[88] *Id.* ¶ 80.
[89] *Id.* ¶ 81.
[90] *Id.* ¶ 82.
[91] *Id.* ¶ 83.

16

was no discussion of the proposed private placement.[92]  At the conclusion of the meeting, the Conflicts Committee approved an increase of the backstop to $650 million and amendment to the Support Agreement reflecting such increase.[93]

On May 25, 2018, the Conflicts Committee met once again, and, following discussion with Greentech concerning the Equity Offering and backstop, the Conflicts Committee invited Stinebaugh and other Brookfield representatives to join the meeting.[94]  The meeting minutes suggest that Brookfield viewed the backstop and the private placement as one in the same—*i.e.* that that backstop was an agreement to sell $650 million in stock to Brookfield regardless of whether TerraForm sold any equity to the public.[95]  The Conflicts Committee however received no advice concerning whether a private placement with Brookfield was in TerraForm's best interests or in any way superior to other financing alternatives besides the Equity Offering.[96]  Both Barclays and Greentech did opine that the Equity Offering would likely be priced below TerraForm's trading price (and thus below the backstop price).[97]  However, the Complaint criticizes both Barclays' and Greentech's comparable transactions analyses on which they respectively relied in

---

[92] *Id.*
[93] *Id.* ¶ 84.
[94] *Id.* ¶ 85.
[95] *Id.*
[96] *Id.* ¶ 86.
[97] *Id.* ¶ 87.

forming this conclusion.[98]  At the conclusion of the May 25, 2018 meeting, the Conflicts Committee reaffirmed its approval of the increase in the backstop to $650 million.[99]

The Conflicts Committee reconvened on May 29, 2018.[100]  The meeting was attended by representatives of Brookfield, including Stinebaugh and Shah, as well as Barclays.[101]  Barclays and the Conflicts Committee discussed certain qualitative benefits of the Equity Offering, but Barclays advised the Conflicts Committee that a marketed equity offering would likely be at a 5%–8% discount to TerraForm's trading price and therefore below the backstop price ($10.66).[102]  Barclays stated that they did not recommend proceeding with the Equity Offering unless the Conflicts Committee was comfortable with the Equity Offering pricing at an 8% discount to market price (that is, the high range of Barclays' projected discount).[103]

The Conflicts Committee met again on June 4, 2018, at which time it was clear that Spanish authorities required all funding for the Saeta Acquisition to be in

---

[98] *Id.* ¶¶ 81, 87.
[99] *Id.* ¶ 88.
[100] *Id.* ¶ 90.
[101] *Id.*
[102] *Id.* ¶ 91.  The qualitative benefits included "(i) providing [TerraForm]with an opportunity directly to address the investor community and communicate [TerraForm's] story and fundamental value, (ii) increasing [TerraForm's] public float and reducing equity overhang, (iii) building and diversifying [TerraForm's] stockholder base and (iv) paving a pathway for subsequent offerings." *Id.*
[103] *Id.*

place within a week (by June 11, 2018).[104] Barclays reiterated their view on the likely discount should TerraForm proceed with the Equity Offering even though Barclays had not received any "price feedback" from investors.[105] Barclays also told the Conflicts Committee that Barclays "was not willing to proceed with the Equity Offering unless [TerraForm] was willing to forego exercising the [backstop] after the Equity Offering had been launched and to consummate the Equity Offering at the per share price fixed by the market."[106] TerraForm's management advised the Conflicts Committee that it recommended that TerraForm exercise the backstop in lieu of proceeding with the Equity Offering.[107] That is, though the backstop was originally conceived to "backstop" any amount of the Equity Offering that was not purchased by existing TerraForm stockholders, TerraForm management recommended doing away with the public offering aspect and instead simply sell the entire amount of the proposed offering directly to Brookfield. Despite the fact that the Conflicts Committee never received advice concerning a private placement with Brookfield, the Conflicts Committee accepted TerraForm management's recommendation and approved full exercise of the backstop—that is, a private placement of $650 million of TerraForm stock with Brookfield at $10.66 per share

---

[104] *Id.* ¶ 92.
[105] *Id.*
[106] *Id.*
[107] *Id.* ¶ 93.

19

(the "Private Placement").[108]  Upon completion of the Private Placement, Brookfield (through its affiliates) owned 65.3% of TerraForm's outstanding common stock.[109]

With the $650 million received from Brookfield, and $471 million in available liquidity, TerraForm acquired approximately 95% of Saeta's shares for an aggregate of $1.12 billion.[110]  Following the tender offer, TerraForm completed a squeeze-out under Spanish law for the remaining shares of Saeta that were not tendered.[111]  TerraForm's stock increased in the aftermath of the Saeta Acquisition and by June 25, 2018 TerraForm's stock was trading at $11.77 per share (more than 10% higher than the Private Placement price).[112]

In October 2019, TerraForm conducted a $250 million public offering for 14,907,573 shares of common stock at a price of $16.77 per share.[113]  Concurrent with this offering, Brookfield entered into a second private placement, purchasing 2,981,514 shares of common stock for $16.77 per share.[114]  Brookfield did not purchase enough shares in this offering to maintain its equity percentage, which subsequently decreased from 65.3% to 61.5%.[115]

---

[108] *Id.*
[109] *Id.* ¶ 94.
[110] *Id.* ¶¶ 95–96.
[111] *Id.* ¶ 97.
[112] *Id.* ¶ 98.
[113] *Id.* ¶ 106 n.19.
[114] *Id.*
[115] *Id.* ¶¶105–06.

20

*E. Procedural History*

Plaintiff Rosson filed a complaint challenging Private Placement on September 19, 2019 alleging breach of fiduciary against Brookfield, and its affiliates (Orion Holdings and BRP Holdings).[116] Plaintiff City of Dearborn Police and Fire Revised Retirement System (Chapter 23) filed a separate complaint on January 27, 2020 also challenging the Private Placement and bringing fiduciary duty claims against Brookfield and the same affiliates, but additionally bringing breach of fiduciary duty claims against Brookfield's director appointees (Lawson, Goldgut, Legault, and Shah), and TerraForm's CEO (Stinebaugh). On February 13, 2020, the Rosson and City of Dearborn actions were consolidated, Rosson and City of Dearborn were appointed as Lead Plaintiffs, and City of Dearborn's complaint was designated as the operative Complaint.[117]

The Complaint alleges three counts of breach of fiduciary duty. Count I is brought against Brookfield, Orion Holdings, and BRP Holdings as controlling stockholders.[118] Count II is brought against Lawson, Goldgut, Legault, and Shah.[119]

---

[116] *See* Verified Stockholder Derivative and Class Action Complaint for Breach of Fiduciary Duties, C.A. No. 2019-0757, Dkt. No. 1.
[117] *See generally* Stip. and Order of Consolidation and Appointment of Lead Pls. and Co-Lead Counsel, Dkt. No. 19.
[118] *See* Compl. ¶¶ 131–41.
[119] *See id.* ¶¶ 142–45.

21

Count III is brought against Stinebaugh.[120] All three counts were brought both derivatively and directly.

On March 26, 2020, the Defendants moved to dismiss the Plaintiffs' direct claims and stay the Plaintiffs' derivative claims.[121] On April 23, 2020, I denied the motion to stay the derivative claims orally.[122] On May 27, 2020, the Plaintiffs moved to strike certain of the affirmative defenses in the Defendants' Partial Answer.[123] On July 16, 2020, I heard Oral Argument on the Motion to Dismiss and Motion to Strike and considered the matters submitted for decision on that date.[124] On July 31, 2020, all outstanding TerraForm shares not already owned by Brookfield were acquired by Brookfield affiliates Brookfield Renewable Partners L.P. and Brookfield Renewable Corporation.[125] In light of that merger, I granted an order dismissing the derivative counts of the Complaint.[126] Because the Plaintiffs' previous Motion to Strike was exclusively concerned with the Defendants' affirmative defenses to the derivative claims,[127] the Order of Partial Dismissal renders the Motion to Strike moot. Accordingly, this Opinion addresses only the Defendants' Motion to Dismiss.

---

[120] *See id.* ¶¶ 146–49.
[121] *See generally* Defs.' Mot to Dismiss and Stay, Dkt. No. 24.
[122] *See generally* Tr. of Oral Arg., Dkt. No. 78.
[123] *See generally* Pls.' Mot. to Strike, Dkt. No. 50.
[124] *See generally* Tr. of Oral Arg., Dkt. No. 78.
[125] *See generally* Stip. and Order of Partial Dismissal, Dkt. No. 80.
[126] *See generally id.*
[127] *See generally* Defs.' Partial Answer and Affirmative Defenses, Dkt. No. 43.

## II. ANALYSIS

"A controlling stockholder owes fiduciary duties to the corporation and its minority stockholders, and it is 'prohibited from *exercising corporate power* . . . so as to advantage itself while disadvantaging the corporation.'"[128] This Memorandum Opinion resolves whether the Plaintiffs have adequately alleged that the Private Placement breached fiduciary duties Brookfield owed *directly* to TerraForm's minority stockholders, or whether the Plaintiffs have instead alleged claims of harm to TerraForm directly, and the minority stockholders only derivatively.

### A. Relevant Legal Standard

The Defendants have moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6).[129] The path to dismissal under Rule 12(b)(6) motion is well-worn:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[130]

---

[128] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018) (quoting *Thorpe v. CERBCO, Inc.*, 1995 WL 478954, at *8 (Del. Ch. Aug. 9, 1995).

[129] Ct. Ch. R. 12(b)(6).

[130] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

When reviewing a motion to dismiss, the Court may take into consideration documents incorporated into the pleadings by reference and judicially noticeable facts available in public SEC filings.[131]

The Defendants suggest that the Plaintiffs lack standing to seek redress for the injury they allege. The issue of whether the Plaintiffs have standing is an issue precedent to consideration of a complaint, and is an issue of law.[132]

*B. Standing*

The doctrinal front on which this Motion is contested is whether the Plaintiffs have standing to pursue direct claims against Brookfield for breach of fiduciary duty. Standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance" and "is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a case or controversy that is appropriate for the exercise of the court's judicial powers."[133]

In support of their Motion to Dismiss, the Defendants contend that the Plaintiffs' claims are exclusively derivative claims belonging to Terraform. Consequently, the Plaintiffs lack standing to pursue such claims directly. In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,[134] the Delaware Supreme Court held that the

---

[131] *Reith v. Lichtenstein*, 2019 WL 2714065, at *1 (Del. Ch. June 28, 2019).
[132] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016).
[133] *Dover Historical Soc'y. v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (citations and internal quotation marks omitted).
[134] 845 A.2d 1031 (Del. 2004).

determination of whether a stockholder's claim is direct or derivative "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[135] Per the Defendants, the claims asserted—though purportedly brought directly—are derivative under *Tooley*, and hence, the Plaintiffs can have no "right to bring an individual action for injuries affecting [their] legal rights as [] stockholder[s]."[136]

The Plaintiffs' retort is twofold. First, the Complaint states direct claims under *Gentile v. Rossette*.[137] Second, the Complaint states direct claims under *Tooley* alone—even without relying on *Gentile*. I evaluate these arguments in reverse order below, finding first that the Complaint does not state direct claims without *Gentile*, but that it does state direct claims under *Gentile*'s rationale. I note ongoing uncertainty over whether *Gentile* remains good law, but find that it is binding Delaware Supreme Court precedent, and thus controlling here.

### C. The Complaint Does Not State Direct Claims under a Classic Tooley Analysis

The Plaintiffs argue that they have made adequate direct claims without relying on the *Gentile* doctrine. They allege that the Private Placement inflicted

---

[135] *Id.* at 1033.
[136] *Id.* at 1036.
[137] 906 A.2d 91 (Del. 2006).

25

*direct* harm on TerraForm's minority stockholders based on the increase in Brookfield's voting power from 51% to 65.3%. Specifically, the Complaint pleads that the Private Placement "solidified Brookfield's control" over TerraForm.[138] In briefing, the Plaintiffs contend that without the Private Placement Brookfield would have eventually lost absolute majority control. They also maintain that Brookfield's increased voting power gave it the ability to eliminate or change minority stockholder protections in TerraForm's Charter.[139] Thus, per the Plaintiffs, the Private Placement worked a direct injury on the minority stockholders.

I note that, because I find *Gentile* controlling below, I could simply deny the Motion to Dismiss on that basis. Because the *Tooley* analysis necessarily informs the Defendants' argument that *Gentile* is no longer viable precedent, and because of the procedural posture here, which seems likely to involve a request for interlocutory appellate relief, I find it appropriate to first briefly examine the Motion to Dismiss under the rubric set out in *Tooley*.

### 1. Dilution is Typically a Derivative Claim Under *Tooley*

Under *Tooley*, in order to plead a direct claim a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she

---

[138] Compl. ¶ 10.
[139] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, Dkt. No. 44, at 22–23.

can prevail without showing an injury to the corporation."[140]  Ordinarily, claims of corporate overpayment[141] are not regarded as direct "because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction."[142]  In fact, corporate overpayment is the quintessence of a claim belonging to an entity: that fiduciaries, acting in a way that breaches their duties, have caused the entity to exchange assets at a loss. This rationale extends even where a controlling stockholder allegedly causes a corporate overpayment in stock and consequent dilution of the minority interest.  This claim is still derivative.  If the issuance was for adequate value, obviously, it did not work a detriment to the stockholder.  In that case, the minority simply beneficially owns a smaller percentage of a bigger corporate pie, enlarged by the proceeds of the sale of equity; the value of its slice remains the same.  If the transaction was for inadequate value, the worth of the stockholder's interest is reduced to the extent the entity was harmed, a classic derivative claim.

The harm is suffered by the entity, and restoring value to the entity would make both it and, derivatively, its stockholders, whole.  While the situation

---

[140] *Tooley*, 845 A.2d at 1039.

[141] That is, claims that the corporation has overpaid for the asset received, and that the controller *underpaid*.

[142] *Gentile*, 906 A.2d at 99.

27

addressed in *Gentile* represents a "species of corporate overpayment claim," as I discuss *infra*, a direct claim *does not* arise "wherever a controlling stockholder extracts economic value from an entity to its benefit and to the detriment of the minority stockholders."[143]  Consequently, a claim that the Private Placement injured stockholders simply because it diluted their ownership interest in TerraForm is alone insufficient to state a direct claim under *Tooley*.[144]

### 2. The Plaintiffs' Entrenchment Argument Fails Reasonable Conceivability

In their non-*Gentile* argument, the Plaintiffs contend that the Private Placement *did not* constitute run-of-the-mill dilution giving rise to solely derivative claims.  Instead, the Plaintiffs contend that the Private Placement entrenched Brookfield as TerraForm's controlling stockholder, and thus TerraForm's minority stockholders suffered a distinct harm, apart from the indirect injury of value and voting dilution.

The Plaintiffs' theory is that Brookfield sought to further entrench itself through the Private Placement as protection against losing its voting majority when TerraForm conducted a $250 million public offering in October 2019.[145]  This theory

---

[143] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1263 n.76 (Del. 2016); *see also In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 818 (Del. Ch. 2005); *Avacus Partners, L.P. v. Brian*, 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990) ("[I]f a board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders are injured derivatively.").
[144] *See Gentile*, 906 A.2d at 99–100.
[145] Compl. ¶¶ 105–06.

28

is somewhat convoluted: Brookfield theoretically entrenched itself *in 2018* in anticipation of failing to purchase sufficient stock to maintain control *in 2019*. The Plaintiffs point to the fact that Brookfield did not purchase enough stock in the 2019 offering to maintain its voting percentage, thereby decreasing its equity ownership from 65.3 to 61.5% following the offering.[146] In other words, had it *not* increased its majority interest in 2018 from 51% to 65.3%, *and* if it had acted in that hypothetical situation as it did in fact—not participating *pro rata* in the 2019 offering (which occurred over a year after the Private Placement)—Brookfield would have lost control of TerraForm.

It is not reasonably conceivable that the Plaintiffs' allegations regarding the 2019 offering state a claim. The Plaintiffs do not allege that anyone knew in June, 2018 that TerraForm would conduct an offering in October, 2019. Moreover, for the Plaintiffs to state a claim under this theory, it would have to be reasonably conceivable that *even had the Private Placement not occurred*, Brookfield would not have participated on a *pro rata* basis in the 2019 offering, thereby choosing to forgo its majority stake. Thus, to adopt the Plaintiffs' view, I must find it reasonably conceivable that Brookfield, as controller of TerraForm, would have allowed TerraForm to issue stock and decrease Brookfield's ownership stake whereby Brookfield would then lose its majority stake in TerraForm *without compensation*.

---

[146] *Id.* ¶ 106.

It is only under such a scenario that the Private Placement could be viewed as entrenchment, under the threat that the 2019 offering— an offering that Brookfield as TerraForm's controller ostensibly approved—would otherwise strip Brookfield of its majority position.

Given that a control premium has value—and likely significant value at that[147]—I find it not reasonably conceivable that Brookfield would have declined to participate in the 2019 offering if such an action would have cost Brookfield its majority stake in TerraForm, thereby forfeiting control of a majority of the voting power of TerraForm for no premium. The required secondary inference imbedded in such a theory—that the 2018 Private Placement was done in anticipation of the 2019 public offering—is likewise unsupported in the record. Consequently, it is not reasonably conceivable that the Private Placement constituted Brookfield's entrenchment in view of the 2019 offering.

The Plaintiffs in briefing made a second argument. They pointed out that Article Thirteen of Terraform's Charter provides that the affirmative vote of at least 66.6% of the combined voting power of all of TerraForm's outstanding shares is required to alter, amend, or repeal certain provisions of the Charter (the "Supermajority Voting Requirement or SVR").[148] The Complaint pleads that

---

[147] *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *13–*14, *16 n.16 (Del. Ch. Oct. 10, 2016).
[148] Compl. ¶ 109.

Brookfield intends to use its increased voting power—65.3%, reduced to 61.5% after Brookfield permitted itself to be diluted in the 2019 offering—to remove the Supermajority Voting Requirement.[149]  Thus, according to the Plaintiffs, the Private Placement put their rights under the SVR at risk, which was a direct injury not shared by Terraform.  There are three defects to this argument: (1) Brookfield never achieved the level of control necessary to unilaterally remove the SVR rights; (2) Brookfield never attempted to abrogate the rights and through the 2019 placement moved *further* from the ability to do so; and (3) the merger has mooted the issue and no damages could attach to any such claim.

To recapitulate, the Plaintiffs have argued that their claims are direct under *Tooley* without invoking *Gentile*, citing allegations that Brookfield used the Private Placement to entrench itself to the detriment of TerraForm's minority stockholders. In other words, the Plaintiffs remained minority stockholders in a controlled entity post-Placement; nonetheless, they argue that Brookfield increased its control via the Private Placement in a way that directly harmed the minority independent of any harm to the entity.  However, as set out above, I find it not reasonably conceivable that the Private Placement served to entrench Brookfield's control of TerraForm. Without an adequate pleading of entrenchment, the Plaintiffs' claims are for harm

---

[149] *Id.* ¶¶ 113–14.

31

that devolved upon the minority as "equity holder[s] in the form of the proportionally reduced value of [their] units—a classically derivative injury."[150]  Thus, under *Tooley* alone, the Plaintiffs' overpayment claims neatly fall into the derivative category.

### D. The Plaintiffs State Direct Claims under Gentile

What follows is the heart of the Plaintiffs' argument.  It is simple and compelling: (1) our Supreme Court in *Gentile* found that where a controller has caused the corporation to issue stock to it for inadequate compensation, the stockholders have a direct claim for relief, and (2) the facts here are indistinguishable from *Gentile*.  *Gentile* involved a corporation's CEO and controlling stockholder who forgave debt the corporation owed to him personally in exchange for additional equity in the corporation.[151]  The debt was convertible contractually, but the CEO and the corporation's board (the CEO and one other individual) agreed to a lower conversion price per share, which had the effect of allowing the CEO to obtain more shares.[152]  A special stockholders meeting was called to authorize the additional shares, but the stockholders were not informed of the underlying purpose: to convert the CEO's debt to equity.[153]  Before the conversion, the CEO held approximately

---

[150] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016).
[151] *Gentile v. Rossette*, 906 A.2d 91, 94 (Del. 2006).
[152] *Id.* at 94–95.
[153] *Id.* at 95.

32

61.19% of the corporation's equity—after the conversion, the CEO held 93.49%.[154] The CEO later negotiated an acquisition of the corporation whereby he received "unique benefits."[155] This Court dismissed the minority stockholders' claim for breach of fiduciary duty against the CEO arising out of the debt conversion because it found that the claim was solely derivative under *Tooley*, and the stockholders lost standing to pursue claims on the corporate behalf after the merger.[156] The appeal to our Supreme Court concerned only the dismissal via summary judgment of the breach of fiduciary duty claim arising from the debt conversion; "the issue before the court [was] whether that claim was *exclusively* derivative in character."[157]

*Gentile* noted that the plaintiffs pled two independent harms arising from the transaction: (1) that the corporation was caused to overpay (in stock) for the debt forgiveness, and (2), the minority stockholders lost a significant portion of the cash value and voting power of their minority interest.[158] The Supreme Court continued that, as noted, *supra*, claims of corporate overpayment are "[n]ormally . . . treated as causing harm solely to the corporation and, thus, are regarded as derivative" because, "in *Tooley* terms . . . the corporation is both the party that suffers the injury (a

---

[154] *Id.*
[155] *Id.*
[156] *Id.* at 96–97.
[157] *Id.* at 97.
[158] *Id.* at 99.

reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow."[159]  The proportionate injury resulting from a corporate overpayment—"the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction"—"is not viewed as, or equated with, harm to specific shareholders individually."[160]

But *Gentile* continued that there is "at least one transactional paradigm," which is "a species of corporate overpayment claim" that is both direct and derivative in character.[161]  A breach of fiduciary duty claim with this dual character arises where:

> (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[162]

Of course, such a transaction gives rise to a derivative claim because the means to achieve the result is an overpayment of shares to the controller, and the corporation

---

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.* at 100.  "[T]he Gentile paradigm only applies when a stockholder already possessing majority or effective control causes the corporation to issue more shares to it for inadequate consideration." *Cirillo Family Tr. v. Moezinia*, 2018 WL 3388398, at *16 (Del. Ch. July 11, 2018), *aff'd*, 220 A.3d 912 (Del. 2019) (TABLE) (italics omitted).

is harmed to the extent of the overpayment.[163]  The derivative nature of this claim is consistent with the dilution-as-derivative rationale explained, *supra*.

However, the *Gentile* court found that the minority stockholders also had a separate *direct* claim arising out of this transactional paradigm.  "Because the shares representing the 'overpayment' embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder."[164]  Consequently, the harm arising from such a transaction is not limited to an equal dilution of the economic value and voting power of each minority-held share—instead, "[a] separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest."[165]  For these reasons, the minority stockholders are harmed "uniquely and individually" to the same extent the controller benefits and are entitled to recover the value represented by the overpayment *directly*.[166]

The facts alleged in the Complaint fit *Gentile*'s transactional paradigm to a T. The Plaintiffs allege that Brookfield—TerraForm's controlling stockholder—caused

---

[163] *Gentile*, 906 A.2d at 100.
[164] *Id.*
[165] *Id.*
[166] *Id.*

35

TerraForm to proceed with the Private Placement and issue shares to Brookfield at an inadequate price.[167] The Complaint also alleges that the Private Placement caused Brookfield's percentage of shares in TerraForm to increase from 51% to 65.3%.[168] TerraForm's minority stockholders suffered a corresponding decrease in their ownership stake in TerraForm.

The Defendants concede that the facts here are consistent with *Gentile*; nonetheless, they argue that I need not follow *Gentile* and instead should engage in a *Tooley* analysis.

The Defendants contend that *Gentile* is not controlling precedent because it "explicitly relied upon and expanded the application" of *In re Tri-Star Pictures, Inc., Litigation*,[169] a case which was disapproved of in *Tooley*.[170] However, *Gentile* was decided *after Tooley*, and *Gentile* holds that the decision therein "fits comfortably within the analytical framework mandated by *Tooley*."[171] Consequently, to the extent that *Gentile* can be said to rely on *Tri-Star*, the *Gentile* decision itself

---

[167] Compl. ¶¶ 100–04.
[168] *Id.* ¶ 105.
[169] 634 A.2d 319 (Del. 1993).
[170] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1038 n.21 (Del. 2004) ("In the *Tri-Star* case, however, this Court lapsed back into the 'special injury' concept, which we now discard.").
[171] *Gentile*, 906 A.2d at 102.

forecloses any argument that *Gentile*'s citation of *Tri-Star* renders *Gentile* irreconcilable with *Tooley*.[172]

Ultimately, the Defendants are left to argue that I need not follow *Gentile* because it was improperly decided. They point to criticism of and limitations on the decision in our courts, which I briefly summarize below.

Gentile has been much discussed, and often distinguished, in the case law, particularly in light of the simple test posed in *Tooley* for determining whether a claim is direct or derivative: who has suffered the injury and to whom will the recovery flow? "Post-*Gentile*, Delaware courts have struggled to define the boundaries of dual-natured claims."[173] In *Gentile*'s immediate aftermath, this Court in one decision found it "clear" that the *Gentile* court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists because "any other interpretation would swallow the general rule that equity dilution claims

---

[172] The Defendants in briefing suggested that *Gentile* is distinguishable from the facts alleged here because in *Gentile* the plaintiffs no longer held any stock due to a liquidation in bankruptcy. *Gentile* does recognize that in the "specific case" presented there "the sole relief that is presently available would benefit only the minority stockholders." *Id.* at 103. In my view, this does not mean that the claim was not derivative in character as well; the Supreme Court noted that "under *Tooley* the claim could be brought derivatively *or* directly." *Id.* (emphasis added). Nothing in *Gentile* limits its application to those instances where the plaintiff stockholders lack standing to bring derivative claims. Thus, *Gentile* would not be distinguishable from the facts pled here on the grounds that the Plaintiffs here continue to hold TerraForm stock. In any event, the point is moot; the post-complaint merger resulted in the loss of the Plaintiffs' stock and the extinguishment of the derivative claims, which have been voluntarily dismissed.
[173] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018).

37

are solely derivative, and would cast great doubt on the continuing vitality of the *Tooley* framework."[174] Via *El Paso,* the Supreme Court has adopted this reasoning, holding that "the *Gentile* paradigm only applies when a stockholder already possessing majority or effective control causes the corporation to issue more shares to it for inadequate consideration."[175]

However, *Gentile*'s limited application to controller transactions was not forgone or obvious. This Court in *Carsanaro v. Bloodhound Technologies, Inc.*,[176] for instance, disagreed with a "line in the sand" limiting *Gentile* to cases involving a majority stockholder.[177] Instead, *Carsanaro* held that *Gentile* also applies to self-interested stock issuances effectuated by a board lacking a disinterested and independent majority.[178] *Carsanaro* noted that the "core insight of [the] dual injury" framework is "the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually."[179] The Court reasoned that what *Gentile* termed expropriation applied with equal force

---

[174] *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).
[175] *Cirillo Family Tr. v. Moezinia*, 2018 WL 3388398, at *16 (Del. Ch. July 11, 2018); *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *9 (Del. Ch. Mar. 26, 2018); *Feldman*, 956 A.2d at 657.
[176] 65 A.3d 618 (Del. Ch. 2013).
[177] *Id.* at 658.
[178] *Id.*
[179] *See id.* at 657–58

where (for example) a self-interested board issued itself stock at a price below current market value.[180] Per *Carsanaro*, *Gentile* should logically extend to any situation where "defendant fiduciaries (i) had the ability to use the levers of corporate control to benefit themselves and (ii) took advantage of the opportunity,"[181] resulting in expropriation from the minority.

*In re Nine Systems Corporation Shareholders Litigation*[182] echoed *Carsanaro*, finding that if the reasoning of *Gentile* were to be respected, "it [would make] little sense to hold a controlling stockholder to account to the minority for improper expropriation after a merger but to deny standing for stockholders to challenge a similar expropriation by a board of directors after a merger."[183] The board of directors, after all, has the exclusive authority to manage and direct the corporation's business affairs, including the power to issue stock.[184] Why then, asked *Nine Systems*, should Delaware law hold controlling stockholders to a higher standard than the board of directors?[185]

---

[180] *Id.* at 658.
[181] *Id.* at 658–59.
[182] 2014 WL 4383127 (Del. Ch. Sept. 4, 2014).
[183] *Id.* at *28.
[184] *See id.* (citing 8 *Del. C.* §§ 141(a), 151–53, 157, 161, 166).
[185] *Id.* at *28. *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018), noted that "*El Paso* . . . implicitly rejected the reasoning of decisions such as . . . *Nine Systems*, which had extended *Gentile* to any dilutive issuance approved by a conflicted board."

*Carsanaro* and *Nine Systems* were an attempt reconcile *Tooley* and *Gentile*. Those cases, since abrogated, along with the reversed trial court decision in *El Paso*, reasoned that the doctrinally consistent way to read *Gentile* (given *Tooley*'s directive) is that *Gentile* stands for the dual-natured character of an expropriation claim. Thus, *Carsanaro* reasoned that both *Tooley* questions could be answered *either way* for a dilutive issuance.[186] Vice Chancellor Noble, in *Nine Systems*, "struggled to articulate" why an expropriation transaction effected by a controller should give rise to dual-natured claims, but an expropriation transaction effected by a board was a solely derivative dilution claim.[187] Citing *Carsanaro* and *Nine Systems*, the reversed trial court opinion in *El Paso* remarked that "*Gentile*'s core insight applies to any insider stock issuance where the value transferred directly to the insider exceeds the share of the loss that the insider suffers through its stock ownership." This line of cases can thus be read as attempts to place *Gentile* within *Tooley*'s overarching framework.

In a concurring opinion in *El Paso*, former Chief Justice Strine proposed resolving this tension in the opposite way. He wrote that *Gentile* "is a confusing decision, which muddies the clarity of our law in an important context."[188] Instead

---

[186] *Carsanaro*, 65 A.3d at 656.
[187] *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *28.
[188] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265–66 (Del. 2016) (Strine, C.J., concurring).

of backing the *Carsanaro* and *Nine Systems* approach—searching for a way to read *Gentile* as consistent with *Tooley*—Chief Justice Strine directly questioned the soundness of *Gentile* and its ongoing viability, remarking that it "cannot be reconciled with the strong weight of our precedent."[189]

Chief Justice Strine reasoned that a dilution claim is a "quintessential example of a derivative claim," that "[a]ll dilution claims involve, by definition, dilution," and that "[t]o suggest that, in any situation where other investors have less voting power after a dilutive transaction, a direct claim also exists turns the most traditional type of derivative claim—an argument that the entity got too little value in exchange for shares—into one always able to be prosecuted directly."[190]   The concern enunciated by Chief Justice Strine in his *El Paso* concurrence is that *Gentile* is inconsistent with *Tooley* and that no sound reason exists to permit this awkward carve-out to an otherwise straightforward doctrine.

I have previously noted that limiting *Gentile* to controller situations, rather than "expanding it to conflicted board non-controller dilution cases, or overruling it entirely, is, as a matter of doctrine, unsatisfying"[191] for the reasons just articulated. The *El Paso* court was able to resolve the issue there narrowly without addressing

---

[189] *Id.* at 1266.
[190] *Id.* at 1265–66.
[191] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 n.147 (Del. Ch. July 26, 2018).

41

the overarching doctrinal issue. The Supreme Court majority in *El Paso* "decline[d] the invitation to further expand the universe of claims that can be asserted 'dually' to hold here that the extraction of solely economic value from the minority by a controlling stockholder constitutes direct injury." This allowed the *El Paso* court to preserve the *Tooley* framework and avoid "largely swallow[ing] the rule that claims of corporate overpayment are derivative [which would result from] permitting stockholders to 'maintain a suit directly whenever the corporation transacts with a controller on allegedly unfair terms.'"[192]

In his *El Paso* concurrence, Chief Justice Strine agreed with the majority that the case at hand—involving a limited partnership—did not require the Supreme Court to consider *Gentile*'s ongoing viability in the corporate context.[193] But the logic of his dissent has been echoed in this Court in *El Paso*'s aftermath: "[w]hether *Gentile* is still good law is debatable;"[194] "the viability of [the *Gentile*] doctrine has been called into doubt;"[195] "there is reason to question whether *Gentile* will remain the law of Delaware."[196]

---

[192] *El Paso*, 152 A.3d at 1264.
[193] *Id.* at 1266 (Strine, C.J., concurring).
[194] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *26 n.206 (Del. Ch. July 21, 2017).
[195] *Cirillo Family Tr. v. Moezinia*, 2018 WL 3388398, at *16 n.156 (Del. Ch. July 11, 2018).
[196] *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *8 n.77 (Del. Ch. Aug. 29, 2018).

Based upon this case history of *Gentile*, and notwithstanding the factual congruence of that case with the one before me, the Plaintiffs argue that *stare decisis* is inapplicable here. "*Stare decisis* . . . is the legal term for fidelity to precedent."[197] The concept is "well established in Delaware jurisprudence," and "[o]nce a point of law has been settled by decision of [the Supreme Court], 'it forms a precedent which is not afterwards to be departed from or lightly overruled or set aside and it should be followed except for urgent reasons and upon clear manifestation of error.'"[198] Thus, unless *Gentile* somehow departs from the *stare decisis* paradigm, it is binding precedent here. The Defendants maintain that *Gentile* is not consistently applied and is not settled law, for the reasons laid out above, and thus *stare decisis* does not mandate denial of the outstanding Motion.

"There is no question that, if the Supreme Court has clearly spoken on a question of law necessary to deciding a case before it, this court must follow its answer."[199] In *El Paso*,[200] the Delaware Supreme Court declined to extend *Gentile* to instances where the expropriation of economic value to a controller was not coupled with any voting rights dilution.[201] *El Paso* held that the claims there—

---

[197] *Fanin v. UMTH Land Development, L.P.*, 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020).
[198] *Account v. Hilton Hotels Corp.*, 780 A.2d 245, 248 (Del. 2001) (quoting *Oscar George, Inc. v. Potts*, 115 A.2d 479, 481 (Del. 1955)).
[199] *In re MFW S'holders Litig.*, 67 A.3d 496, 520 (Del. Ch. 2013).
[200] 152 A.3d 1248 (Del. 2016).
[201] *Id.* at 1264.

involving a limited partner's claim that the partnership had overpaid the controlling general partner for assets held by the general partner's parent—did not "satisfy the unique circumstances presented by the *Gentile* 'species of corporate overpayment claim[s].'"[202] The takeaway from *El Paso* is that "*Gentile* and its progeny should be construed narrowly,"[203] and that "*Gentile* must be limited to its facts, which involved a dilutive stock issuance to a controlling stockholder."[204] But *El Paso* did not overrule *Gentile.*

I have laid out above the cases involving criticism of *Gentile*, upon which the Defendants rely to argue that I am at liberty to disregard the case.

The Defendants argue stoutly that the *Gentile* doctrine, in light of the case analysis above, is moribund, and that I should disregard it. That argument is misplaced. Our system does not work that way, and if it did, the results would bleed value from the orderly development of the common law. As a trial court judge, I am not free to decide cases in a way that deviates from binding Supreme Court precedent.[205] This is not merely a matter of respect for superior authority; the proper development of the common law, and its utility, rest on a balance of judicial

---

[202]*Id.* (quoting *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006)). Notably, the limited partner "never alleged and did not prove" that the partnership's overpayment increased the general partner's or the general partner's parent's control at the expense of the limited partners. *Id.*

[203] *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *8 n.77 (Del. Ch. Aug. 29, 2018).

[204] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018).

[205] *See, e.g.*, *In re Cornerstone Therapeutics Inc. Stockholder Litig.*, 2014 WL 4418169 (Del. Ch. Sept. 10, 2014), *rev'd sub nom*, *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173 (Del. 2015).

44

responsiveness *and* certainty, as represented by employing the doctrine of *stare decisis* to bind the trial courts. Under this rubric, if law settled by our Supreme Court is to be changed, it requires a reasoned analysis by that Court; under this rubric, our common law develops in an orderly way[206] that provides that consistency that is itself an attribute of justice.[207]

Where a Supreme Court precedent inexorably commands a result, my obligation as a trial court judge is to follow the Supreme Court's directive. Here, the facts alleged are doctrinally indistinguishable from those facts to which *Gentile* is limited, a circumstance that the Defendants do not contest. This is the rare case that perfectly fits the narrow *Gentile* paradigm, and *Gentile* mandates that the direct claims pled survive the Defendant's Motion to Dismiss.

Consistent with *Gentile*, the Plaintiffs have made a sufficient pleading that Brookfield is TerraForm's controller, that Brookfield caused TerraForm to issue excessive shares of its stock in exchange for insufficient consideration, and that the exchange caused an increase in the percentage of the outstanding shares owned by Brookfield, and a corresponding decrease in the share percentage owned by the public (minority) stockholders. Such a pleading is sufficient, under controlling

---

[206] *E.g Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (holding that *stare decisis* promotes the "evenhanded, predicable and consistent development" of the law).

[207] *See State v. Barnes*, 116 A.3d 883, 890–911 (Del. 2015) (explaining that "[t]he doctrine of *stare decisis* exists to protect the settled expectations of citizens because '[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and conform their conduct accordingly')" (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 256 (1994)).

45

Supreme Court precedent, to withstand the Defendant's Motion to Dismiss the Plaintiffs' direct claims.

## III. CONCLUSION

The Defendants' Motion to Dismiss is DENIED. The parties should submit a form of order consistent with this Memorandum Opinion.